# EXHIBIT B

## IN THE CHANCERY COURT OF TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

MEMPHIS IN MAY INTERNATIONAL
FESTIVAL, INC.

     Plaintiff,

vs.

    No. CH-24-0403    Part 1

    JURY DEMANDED

ARCH INSURANCE COMPANY
and
ARCH INDEMNITY INSURANCE COMPANY

    Defendants.

SHELBY COUNTY
CHANCERY COURT
APR - 2 2024
W. AARON HALL, C&M
TIME: 11:07   BY:

## COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT AND OTHER RELIEF

COME NOW Plaintiff Memphis in May International Festival, Inc. ("**Plaintiff**"), by and through counsel, and for its Complaint for Breach of Contract, Declaratory and Other Relief against Defendants Arch Insurance Company and Arch Indemnity Insurance Company (collectively "**Defendant**" unless specified), would respectfully show and state as follows:

### PARTIES

1.      Plaintiff is a Tennessee not for profit corporation with its principal place of business located at 56 South Front Street, Memphis, Tennessee 38103.

2.      According to the Insurance Division of the Tennessee Department of Commerce and Insurance, Defendant Arch Insurance Company is foreign insurance company with its principal place of business located at 300 Plaza Three, 3rd Floor, Jersey City, New Jersey 07311. Defendant Arch Insurance Company may be served through the Tennessee Insurance Commission Insurance Division at 500 James Robertson Parkway, Nashville, Tennessee 37243, and its NAIC Code is 11150.

1

3.     According to the Insurance Division of the Tennessee Department of Commerce and Insurance, Defendant Arch Indemnity Insurance Company is foreign insurance company with its principal place of business located at 300 Plaza Three, 3rd Floor, Jersey City, New Jersey 07311. Defendant Arch Indemnity Insurance Company may be served through the Tennessee Insurance Commission Insurance Division at 500 James Robertson Parkway, Nashville, Tennessee 37243, and its NAIC Code is 30830.

4.     At all times pertinent hereto, Defendants were qualified and licensed to underwrite insurance coverage in the state of Tennessee.

## JURISDICTION AND VENUE

5.     Jurisdiction and venue are proper in this Court since the insurance policy giving rise to this cause was procured by Plaintiff in Shelby County, Tennessee and the acts and failures to act giving rise to this cause took place in and about Shelby County, Tennessee.

## FACTUAL BACKGROUND

### The Festival, Contest and Rental Agreement

6.     Plaintiff is a non-profit company that has owned and operated the Beale Street Music Festival (the "**Festival**") and the World Championship Barbecue Cooking Contest (the "**Contest**") since the 1970s.

7.     Plaintiff has conducted the Festival and Contest in or around Tom Lee Park and the area surrounding the banks of the Mississippi River in downtown Memphis.

8.     Since it began owning and operating the Festival and Contest, Plaintiff has purchased insurance to protect against property and other damage to those areas of downtown Memphis in which the Festival and Contest were conducted.

2

9.    As it had done in past years, Plaintiff signed a document entitled "Tom Lee Park Rental Agreement" dated March 3, 2023 (the **"Rental Agreement"**) whereby Plaintiff agreed to utilize the premises located in or around Tom Lee Park and the area surrounding the banks of the Mississippi River in downtown Memphis from "Memphis River Parks Partnership" (**"MRPP"**) to conduct the Festival and Contest. A copy of the Rental Agreement is attached hereto as **Exhibit 1** and incorporated herein by reference

10.    According to the Terms and Conditions of the Rental Agreement, MRPP allowed Plaintiff to utilize "Tom Lee Park, Ashburn-Coppock Park and staircases at Vance, Huling, and Butler, and the ADA ramp on the Cutbank Bluff for wheelchair access-only" (collectively the **"MRPP Property"**) to conduct the Festival and Contest in May, 2023. See Rental Agreement, Terms and Conditions, at p. 1.

11.    The Terms and Conditions provided that Plaintiff could utilize the MRPP Property to conduct the Festival and Contest "only during ticketed entry hours on May 5, 2023 through May 7, 2023, and on May 17, 2023 through May 20, 2023." See Rental Agreement, Terms and Conditions, at p. 1.

12.    According to Section 3(b) of the Rental Agreement, Plaintiff was responsible "for the cost of repair or replacement of any and all damages, including damage that may result from vandalism, that occur during the rental period. . . ." See Rental Agreement, Section 3(b)(Emphasis supplied).

13.    Section 11 of the Terms and Conditions of the Rental Agreement provides that Plaintiff: (a) " is responsible for all damages and vandalism occurring during event rental period subject to the Tom Lee Rental Agreement Section 3(b)"; and (b) "will be responsible at its expense and billed for the cost of repair and/or replacement of any and all damage/vandalism subject to the

3

Tom Lee Rental Agreement Section 3(b)." See Rental Agreement, Terms and Conditions, at Section 11(Emphasis supplied).

14.    Section 11 of the Terms and Conditions of the Rental Agreement set forth a procedure(s) for inspecting the MRPP Property before, during and after the Festival and Contest to determine the necessary "repair/replacement work to restore the Park to pre-event condition." See Rental Agreement, Terms and Conditions, at Section 11.

**The Insurance Policies**

15.    In or around February, 2023, Defendants and their agents were provided with a "Fair Liability Application" in connection with the insurance that Plaintiff was required to procure in connection the Festival and Contest to be conducted in May, 2023.

16.    As of March 2, 2023, Defendants and their agents knew that Plaintiff intended to use the MRPP Property to conduct the Festival and Contest pursuant to a short-term lease for the time periods set forth in the Rental Agreement and the "Fair Liability Application," and that Plaintiff may be held responsible or liable for property and other damages caused by or resulting from Plaintiff's limited use of said Property to conduct the Festival and Contest.

17.    In reliance upon the representations of Defendant and their agents that they could provide Plaintiff with the requisite and necessary insurance coverage for property and other damages caused by or resulting from Plaintiff's limited use of said Property to conduct the Festival and Contest, Plaintiff agreed to purchase insurance from Defendants.

18.    On or about March 2, 2023, Plaintiffs purchased and Defendant Arch Insurance Company issued Arch General Liability Policy No. SNCGL3628400 (which formed a part of Master Policy Number SJCGL0000206), which included a "Coverage Period" from March 1, 2023 to March 1, 2024, and any endorsements or extensions thereto. On or about the same date, Plaintiffs purchased

4

and Defendant Arch Indemnity Insurance Company issued Arch Excess Liability Policy No. SNFXS0149300 (which formed a part of Master Policy Number SJFXS0000806), which included a "Coverage Period" from March 1, 2023 to March 1, 2024, and any endorsements or extensions thereto (collectively the "**Policies**," unless specified).

19.    According to the General Liability Policy, Defendant Arch Insurance Company agreed to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." See General Liability Policy, Commercial General Liability Coverage From (CG 00 01 04 13), at Section I (1)(a).

20.    The General Liability Policy also provides that Defendant Arch Insurance Company "will have the right and duty to defend the insured against any 'suit' seeking" damages for such "bodily injury" or "property damage." See General Liability Policy, Commercial General Liability Coverage From (CG 00 01 04 13), at Section I (1)(a).

21.    According to the Excess Liability Policy, Defendant Arch Indemnity Insurance Company agreed to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies." See Excess Liability Policy, Section I(1)(a).

22.    The Excess Liability Policy also provides that Defendant Arch Indemnity Insurance Company "will have the right and duty to defend the insured against any suit seeking damages for such 'injury or damage' when the applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance." See Excess Liability Policy, Section I(1)(a).

23.    MRPP and the City of Memphis are both named as Additional Insureds on the General Liability Policy and the Excess Liability Policy.

**The Post-Festival Damages**

24.    Plaintiff used portions of the MRPP Property to conduct the Festival and Contest during the time periods set forth in the Rental Agreement.

25.    During Plaintiff's limited use of the MRPP Property to conduct the Festival and Contest, certain areas of said Property sustained property and other damage as result of, among other things, unexpected and unforeseen actions and events that were not expected nor foreseeable by Plaintiff.

26.    The damage to the MRPP Property described in the preceding paragraph did not exist prior to Plaintiff's limited use of said Property to conduct the Festival and Contest, and the nature and extent of said property and other damages were not expected nor foreseeable by Plaintiff.

27.    Plaintiff and MRPP conducted the procedure(s) for inspecting the MRPP Property after the Festival and Contest as set forth in the Rental Agreement, which included an itemization of property and other damage to certain areas of the MRPP Property that did not exist prior to Plaintiff's limited use of said Property to conduct the Festival and Contest.

28.    Pursuant to correspondence dated August 2, 2023, MRPP presented Invoice No. 41826 to Plaintiff in the total amount of $1,425,366.00. A copy of said correspondence is attached hereto as **Exhibit 2**. A copy of Invoice No. 41826 is attached hereto as **Exhibit 3** and incorporated herein by reference.

29.    The amount set forth in Invoice No. 41826 was based on a document entitled "TLP Post Festival Damages Repair Estimate" prepared by Montgomery Martin Contractors, LLC ("**Montgomery Martin**") and dated June 26, 2023. A copy of said Repair Estimate is attached hereto as **Exhibit 4** and incorporated herein by reference.

30.     According to MRPP Invoice No. 41826, the following amounts were credited against the sum of $1,425,366.00 set forth in MRPP Invoice No. 41826: Credit for City of Memphis Invoice ($350,000.00); Credit for Memphis in May Escrow ($250,000.00); Credit for City of Memphis Invoice ($150,000.00).

31.     According to MRPP Invoice No. 41826, and after application of the foregoing Credits from Plaintiff and the City of Memphis, the "Balance Due" totaled the sum of $675,366.00.

32.     Plaintiff has disputed that MRPP is entitled to the total sum of $1,425,366.00 to repair the property and other damage(s) to those areas of the MRPP Property that did not exist prior to Plaintiff's limited use of said Property to conduct the Festival and Contest.

33.     Based on its position set forth in the preceding paragraph and its Answer filed in the "MRPP Litigation" defined below, Plaintiff did not pay the "Balance Due" set forth in MRPP Invoice No. 41826 in the amount of $675,366.00.

**MRPP Litigation**

34.     On or about September 8, 2023, MRPP filed a "Complaint for Breach of Contract" against Plaintiff in the Circuit Court of Shelby County, Tennessee under Docket No. CT-3703-23 (Div. 9) (the "**MRPP Litigation**"). A copy of the Complaint filed in the MRPP Litigation (without Exhibits) is attached hereto as **Exhibit 5** and incorporated herein by reference.

35.     According to paragraph 14 of the Complaint, the Rental Agreement "required MIM to be 'responsible for all damages and vandalism occurring during event rental period subject to the [Agreement] Section 3(b).'" See Complaint, at ¶ 14.

36.     Paragraphs 25 and 26 of the Complaint allege that the "total damage repair cost because of the Events was $1,425,366.00," but because a portion of these costs have been paid,

7

MRPP also alleges that Plaintiff remains liable for the "Balance of Repair Costs" (as defined in the Complaint) in the sum of $675,366.00. See Complaint, at ¶ 25, 26.

37.    The damages being sought from Plaintiff in the MRPP Litigation include the cost to repair and replace certain areas of the MRPP Property that sustained property and other damage(s) as result of, among other things, Plaintiff's limited use of the MRPP Property to conduct the Festival and Contest.

38.    Pursuant to correspondence dated October 13, 2023, Defendants acknowledged receipt of the Complaint filed in the MRPP Litigation and stated that "the claimed property damages occurred during the policy period. . . .[and] the claimed damages were shown to not have existed prior to use and/or occupancy of the Park by MIM."

39.    Pursuant to correspondence dated October 13, 2023, Defendants acknowledged that the damages sought from Plaintiff in the MRPP Litigation "appear to be related to the crowds of people who visited the Park during the Events hosted by MIM or related to the set up and/or move out during the occupancy period. . . . [and] therefore constitute an 'occurrence' under this Policy."

40.    Pursuant to correspondence dated October 13, 2023, Defendants acknowledged that "while the Agreement did contemplate that damage and/or vandalism may occur and apportioned responsibility for payment of repairs, it was not foreseeable that there would in fact be damages or repairs necessary to exceed a certain threshold or that would in fact be incurred."

41.    Pursuant to correspondence dated October 13, 2023, Defendants acknowledged that "there has been physical injury to tangible property, which was the result of an accident, or at a minimum, continuous and repeated exposure to substantially the same general harmful conditions."

8

42.     Plaintiff timely made a claim against the Policies in connection with the damages sought from Plaintiff as set forth in the Complaint filed in the MRPP Litigation, but Defendants denied that there was coverage under the Policies pursuant to correspondence dated October 13, 2023.

43.     As set forth in correspondence dated November 16, 2023, Plaintiff disputed that the Policies did not provide coverage for the property and other damages sought from Plaintiff in the MRPP Litigation, and maintained that Plaintiff was entitled to all coverage, compensation and other relief afforded under the Policies in connection with said damages and Litigation. A copy of said correspondence is attached hereto as **Exhibit 6** and incorporated herein by reference.

44.     Pursuant to said correspondence dated November 16, 2023, Plaintiff provided Defendants with notice that it would seek all relief afforded by Tenn. Code Ann. § 56-7-105 in the event that Defendants failed and refused to honor their obligations under the Policies.

45.     Despite its prior acknowledgement on October 13, 2023 that the property and other damages sought from Plaintiff in the MRPP Litigation constituted an "occurrence" under the Policy, in correspondence dated January 18, 2024, Defendants reversed their position that there was no such "occurrence" because said damages "were the expected outcome of MIM's refusal to abide by its contractual obligations, not any unforeseen or unexpected event."

46.     Defendants have failed and refused to honor their obligations under the Policies and/or to afford Plaintiff all coverage to which it is entitled under the Policies in connection with the damages sought from Plaintiff in the MRPP Litigation.

## Count I-Declaratory Relief

47.     Plaintiffs incorporate and reallege the previous allegations as if fully set forth herein.

9

48.     This Court has the authority to issue Declaratory Judgments pursuant to all applicable rules and statutes, and including but not limited to Rule 57 of the Tennessee Rules of Civil Procedure, and the relevant provisions of Tenn. Code Ann. § 29-14-101, et seq..

49.     According to the Complaint filed in the MRPP Litigation, Plaintiff is "responsible for all damages and vandalism" that occurred during Plaintiff's limited use of the MRPP Property to conduct the Festival and Contest. See Complaint, at ¶ 14.

50.     Based on the allegations in the Complaint filed in the MRPP Litigation, the damages being sought in the MRPP Litigation include the cost to repair and replace certain areas of the MRPP Property that sustained property and other damage(s) as result of, among other things, unexpected and unforeseen actions and events that were not expected nor foreseeable by Plaintiff.

51.     The nature and extent of the damages being sought in the MRPP Litigation were not expected nor foreseeable by Plaintiff

52.     Based on the allegations in the Complaint filed in the MRPP Litigation, Plaintiff may become legally obligated to pay some, all or portions of the damages being sought by MRPP in said Litigation, and the amount of such damages may exceed the insurance limits in the General Liability Policy.

53.     The property and other damages being sought from Plaintiff in the MRPP Litigation are alleged to have occurred during the period of the Policy, and did not exist prior to Plaintiff's limited use of the MRPP Property to conduct the Festival and Contest,

54.     There are no exclusions under the Policies which apply or which otherwise would prevent coverage or provide a basis for denial of coverage for the property and other damages sought from Plaintiff in the MRPP Litigation.

10

55.    Based on the foregoing, Plaintiff is entitled to a declaratory judgment: (a) that there is coverage under the Policies for the damages sought from Plaintiff as set forth in the Complaint filed in the MRPP Litigation; (b) that Defendants have a duty to defend Plaintiff in said Litigation; and (c) that Defendants have a duty to indemnify Plaintiff for all damages that it may become legally obligated to pay in connection with the MRPP Litigation, and including but not limited to any damages that may be awarded to MRPP in said Litigation and the costs and fees incurred by Plaintiff in defending itself in connection therewith.

## Count II-Breach of Contract

56.    Plaintiffs incorporate and reallege the previous allegations as if fully set forth herein.

57.    The Policies include coverage for the property and other damages being sought from Plaintiff in the MRPP Litigation.

58.    Plaintiff made a claim under the Policies in connection with the property and other damages being sought from Plaintiff in the MRPP Litigation.

59.    Plaintiff has made demand under the Policies for Defendant to defend Plaintiff in the MRPP Litigation and to indemnify Plaintiff for any damages that it may become legally obligated to pay in connection with the MRPP Litigation (and including amounts that exceed the limits of insurance in the General Liability Policy), and including but not limited to any damages that may be awarded to MRPP in said Litigation and the costs and fees incurred by Plaintiff in defending itself in connection therewith, but Defendants have denied said demand(s) and failed and refused to defend Plaintiff in said Litigation

60.    At all times material hereto, Plaintiff has complied with the terms of the Policies.

61.    Defendants have materially breached the Policies as a result of, among other things: (a) wrongfully denying coverage under the Policies in connection with the damages sought from

11

Plaintiff in the MRPP Litigation; (b) failing and refusing to defend Plaintiff in said Litigation; (c) failing to indemnify Plaintiff for all damages that it may become legally obligated to pay in connection with the MRPP Litigation, and including but not limited to any damages that may be awarded to MRPP in said Litigation and the costs and fees incurred by Plaintiff in defending itself in connection therewith; and (d) breaching the duty of good faith and fair dealing.

62.    Plaintiff has been damaged as a result of Defendants' material breach(es) of the Policies in an amount to be proven at trial, but in no event less than the sum of any and all damages that it may become legally obligated to pay in connection with the MRPP Litigation, and including but not limited to any damages that may be awarded to MRPP in said Litigation and the costs and fees incurred by Plaintiff in defending itself in connection therewith.

### Count III-Promissory Estoppel/Detrimental Reliance

63.    Plaintiffs incorporate and reallege the previous allegations as if fully set forth herein.

64.    Prior to issuance of the Policies, Defendants and their agents knew: (a) that Plaintiff was required to procure certain monetary limits of general liability and excess insurance before it could conduct the Festival and Contest; (b) that Plaintiff intended to utilize the MRPP Property to conduct the Festival and Contest; and (c) that Plaintiff would be held responsible for property and other damages that were caused by or resulted from its limited use of said Property to conduct the Festival and Contest.

65.    Prior to issuance of the Policies, Defendants and their agents knew or should have known that Plaintiff could be responsible or liable to MRPP for property and other damage(s) to certain areas of the MRPP Property that were caused by or resulted from Plaintiff's limited use of said Property to conduct the Festival and Contest and which did not exist prior to said limited use.

12

66. Plaintiff reasonably relied on the representations of Defendant and its agents that the Policies provided the requisite and necessary insurance coverage for property and other damages caused by or resulted from Plaintiff's limited use of said Property to conduct the Festival and Contest.

67. Defendants should have reasonably expected Plaintiff to rely on the representations of Defendant and its agents that the Policies provided the requisite and necessary insurance coverage for property and other damages caused by or resulted from Plaintiff's limited use of said Property to conduct the Festival and Contest.

68. In order to avoid injustice, the Court should enforce the representations of Defendant and its agents that the Policies provided the requisite and necessary insurance coverage for property and other damages caused by or resulted from Plaintiff's limited use of said Property to conduct the Festival and Contest.

## Count IV-Statutory Bad Faith

69. Plaintiffs incorporate and reallege the previous allegations as if fully set forth herein.

70. By correspondence dated November 16, 2023, Plaintiff made final demand upon Defendants to honor their obligations under the Policies and, among other things, defend and indemnify Plaintiff in connection with the damage(s) being sought from Plaintiff in the MRPP Litigation, and provided Defendant with notice of its intent to assert a bad faith claim pursuant to the relevant provisions of Tenn. Code Ann. § 56-7-105. See Exhibit 6.

71. Defendants did not pay, agree to defend, indemnify, pay or otherwise take any action in connection with Plaintiff's claim against the Policies and written demand dated November 16, 2023, and more than sixty (60) days have elapsed since the date of Plaintiff's final demand for coverage under the Policies dated November 16, 2023.

13

72.    The actions of Defendants described herein, and including but not limited to its failure to defend Plaintiff in the MRPP Litigation, constitute statutory bad faith entitling Plaintiff to the maximum statutory penalties, along with any other appropriate relief under the circumstances and including attorneys' fees, allowed by Tenn. Code Ann. § 56-7-105.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff Memphis in May International Festival, Inc. respectfully prays:

1.    That a copy of this Complaint be served upon Defendants requiring them to answer as required by applicable law;

2.    That pursuant to Count I, Plaintiff be awarded a judgment declaring that: (a) that there is coverage under the Policies for the damages sought from Plaintiff by MRPP as set forth in the Complaint filed in the MRPP Litigation; (b) that Defendants have a duty to defend Plaintiff in said Litigation; and (c) that Defendants have a duty to indemnify Plaintiff for all damages that it may become legally obligated to pay in connection with the MRPP Litigation, and including but not limited to any damages that may be awarded to MRPP in said Litigation and the costs and fees incurred by Plaintiff in defending itself in connection therewith.

3.    That pursuant to Count II, Plaintiff be awarded a judgment in an amount to be proven at trial, but in no event less than the total sum of any damages that may be awarded to MRPP in the MRPP Litigation and the total sum of all costs and fees incurred by Plaintiff in defending itself in connection with said Litigation;

4.    That pursuant to Count III, Plaintiff be awarded a judgment in an amount to be proven at trial, but in no event less than the total sum of any damages that may be awarded to MRPP in the MRPP Litigation and the total sum of all costs and fees incurred by Plaintiff in defending itself in connection with said Litigation;

14

5.     That pursuant to Count IV, Plaintiff be awarded the maximum statutory penalties, along with any other appropriate relief under the circumstances and including attorneys' fees, allowed by Tenn. Code Ann. § 56-7-105;

6.     That a jury be empaneled for the trial of this matter;

7.     That Plaintiffs be awarded interest on all such amounts; and

8.     That Plaintiffs be awarded such further and general relief to which they may be entitled.

Respectfully submitted,

Adam M. Nahmias (Tenn. Bar No. 16227)
Law Offices of Libby & Nahmias
5384 Poplar Ave., Suite 410
Memphis, Tennessee 38119
(901) 343-0777
adam@lnlawmemphis.com
*Attorneys for Plaintiff*

15

## TOM LEE PARK RENTAL AGREEMENT

This Rental Agreement ("Agreement") is made and entered into this 3 day of _March_ 2023, by and between the **MEMPHIS RIVER PARKS PARTNERSHIP ("Partnership")** acting on behalf of the City of Memphis, Tennessee, a municipal corporation of the State of Tennessee (the "City"), and **MEMPHIS IN MAY INTERNATIONAL FESTIVAL, INC. ("Renter")**.

1. Partnership hereby grants permission to Renter to use the Park (as defined in the Terms and Conditions) on the dates and at the times described herein, upon the terms and conditions set forth herein and in the attached Terms and Conditions, for the Beale Street Music Festival (BSMF) and World Championship Barbeque Cooking Contest (WCBCC) (the "Event"). Renter shall have the right to occupy and use the Park from April 22 - May 27, 2023 (the "Event Period"). During the Event Period, Renter will charge various parties to enter the Park to participate in two events. One event takes place May 5 - 7, 2023. The other takes place May 17 - 20, 2023.

The agreed upon occupancy period for the 2023 events shall be from 12:01 a.m. on April 22, 2023, through 11:59 p.m. on May 27, 2023. Park shall be clear of all construction equipment and debris and suitable for Renter to begin event set-up at 12:01 a.m. on April 22, 2023.

2. The Renter will use the Park for the Event (which includes Beale Street Music Festival and Barbecue Cooking Contest) including, in each case, the necessary set-up in the Park, the disassembly following the use thereof, and such sales or promotional activity as is deemed necessary by Renter and as is in compliance with the Terms and Conditions, and for no other purpose whatsoever without the prior written consent of Partnership.

3. For the rights granted to Renter by Partnership as provided for herein, Renter agrees to pay Partnership the following fees:

(a)     $100,000.00     For use of the Park during the Event Period beginning with initial setup and through completed move-out. One-half of this amount ($50,000.00) is to be paid before occupying the Park and one-half of this amount ($50,000.00) is to be paid within 10 days of vacating the Park after the Event.

(b)     $250,000.00     Renter shall establish an escrow account by March 1, 2023 in the amount of $250,000.00 to serve as a Damages deposit to be used for the cost of repair or replacement of any and all damages, including damage that may result from vandalism, that occur during the rental period as follows:
1) The City of Memphis will appoint a Neutral Third Party to determine all damages and identify items to be repaired or restored in accordance with the resolution once approved by the Memphis City Council ("Restoration Resolution") regarding the allocation of $500,000 which is incorporated herein by reference and attached hereto as Exhibit 6.

1





2) The City of Memphis shall be responsible to pay the first $350,000.00 of such damages in accordance with the Restoration Resolution once approved. The Partnership will notify the Escrow Agent and the Renter with a description and cost to repair the damages as per paragraph 11 of the Terms. The Escrow Agent will fund the cost to repair within twenty-four hours of the notice.

3) The Renter's $250,000.00 escrow funds shall be used if total restoration charges exceed the $350,000.00 allocated by the Restoration Resolution once approved.

4) If restoration charges exceed the $600,000.00 provided by the City of Memphis and Renter, the City of Memphis shall be responsible to pay up to an additional $150,000.00 for damages in accordance with the Restoration Resolution once approved.

5) Renter shall be responsible for damages in the excess of $750,000.00.

6) The cost to repair damages shall be reasonable and consistent with contract prices contained in the Tom Lee Park construction contract between Partnership and Montgomery Martin, LLC, taking into consideration changes in current day costs in material and labor. All damage repairs will be made in accordance with the contract document plans and specifications.

(c)    $15,000.00    Shall be payable at the time of signing this agreement to serve as a Utility/Water Deposit. Renter shall pay all utility/water costs from its use of the Park for the Event. This shall include all electrical consumption and demand charges and water and sewer charges levied by Memphis Light, Gas and Water Division (MLG&W). All utility/water cost over and above Partnership's previous twelve (12) month average shall be paid by the Renter.

(d)    Amounts unpaid after due date shall bear interest at 9% annum.

4. This Agreement is subject to the Terms and Conditions attached hereto and made a part hereof.

5. This Agreement is based on Renter providing Partnership with copies of all necessary street closures and permits required by government entities.

6. Vacating of Park – For every day Renter is late vacating the Park, Renter shall pay Partnership a late fee of $5,000.00 per day, to be paid within 30 days of vacating the Park after the Event.

7. Renter shall promote positive messages about the Park and urge its vendors, volunteers, BBQ team members and guests, and ticket buyers to respect the Park to avoid damaging the Park property. Evidence of such messaging will be provided to the Partnership.

2



[Signature page follows]

3



IN WITNESS WHEREOF, the parties have duly executed this instrument the day and year first above written.

MEMPHIS RIVER PARKS PARTNERSHIP

BY: _____

DATE: 3/3/23

MEMPHIS IN MAY INTERNATIONAL FESTIVAL, INC.

BY: _____

DATE: 3/3/23

4

## TERMS AND CONDITIONS

The Terms and Conditions are incorporated into and made a part of the Rental Agreement to which they are attached. Terms not defined herein shall have the meaning defined in the Rental Agreement. (The "**Park**" as used herein and in the Rental Agreement includes Tom Lee Park, Ashburn-Coppock Park and staircases at Vance, Huling, and Butler., and the ADA ramp on the Cutbank Bluff for wheelchair access-only and only during ticketed entry hours on May 5, 2023, through May 7, 2023, and on May 17, 2023, through May 20, 2023.)

1.      The obligations of Renter with respect to the payment of rent and other amounts under this Agreement shall survive the expiration or early termination of this Agreement, except as otherwise provided in this Agreement

2.      If the Renter cancels event(s): (a) Before March 1, 2023, then all expenses and rent are waived. (b) Post March 1, 2023, then the Renter shall be responsible for expenses incurred by the Partnership related to the preparation and set up for the Event, damages and utility/water expenses which occur during Renter's occupancy of the Park, and a pro rata share of rent based on the length of occupancy.

If the Renter is unable to use the Park pursuant to a Force Majeure event(s) for any of its two main events, Beale Street Music Festival (BSMF) and World Championship Barbeque Cooking Contest (WCBCC), then the rental payments shall be reduced on a pro rata basis based on event days utilized, in addition to damages and expenses as per above

3.      Representatives of Partnership shall be designated by the Partnership prior to the event and shall have the right to enter all portions of the Park at any time and on any occasion, including entering the portion of the Park rented to Renter. Renter shall and shall cause its agents, servants, employees, contractors, guests and invitees to use and occupy the portion of the Park rented to it under this Agreement in a safe and careful manner and comply with all rules and regulations promulgated by Partnership as stated in this Agreement and its Exhibits. and all applicable municipal, county, state and federal laws, rules and regulations (including with limitation those prescribed by the fire and police departments). Partnership shall have the right to immediately terminate this Agreement upon the failure to comply with the Rental Agreement, Terms and Conditions and with such laws, rules and regulations in any material respect, including without limitation, laws and regulations regarding the sale and distribution of alcoholic beverages or illegal drugs. In the event of a violation and/or breach that can be cured within twenty-four (24) hours and if such cure will eliminate all risk to safety and/or property damage then the Renter will be provided written notice (either electronically or otherwise) and allowed twenty-four (24) hours to cure. If not cured within twenty-four (24) hours or if no cure is feasible then termination

5



will occur immediately. In the event of an uncured material breach by Renter of one or more of the provisions of this Lease Agreement, Partnership may refuse to allow Renter to take possession of the premises, or if Renter is already in such possession, may stop all activities of Renter on premises and oust Renter therefrom provided; however, Partnership shall not have the right to interfere with the performance of the Events if such performance can reasonably occur in Partnership's sole discretion without causing injury or damage to visitors, guests or Park property.

4.      Any exclusive use of the Park by Renter shall be limited to the places and times shown in this Agreement (May 5 - 7, 2023 and May 17   20, 2023) or as otherwise agreed in writing by Renter and Partnership.

5.      Renter agrees to take reasonable steps to assure that the sale of alcoholic beverages in the Park is in compliance with all applicable laws and regulations, federal, state and local, including without limitation, laws and regulations with respect to sales to minors and sales to intoxicated individuals.  Renter will take reasonable steps to train or assure the training of its employees, agents and sub-contractors in connection with the sale of alcoholic beverages with respect to preventing sales of alcoholic beverages to minors and intoxicated individuals, including without limitation, assuring that servers of alcoholic beverages are certified.  When appropriate, Renter will hold pre-Event meetings with security and its agents, employees and contractors who are serving alcoholic beverages with respect to procedures regarding sales of alcoholic beverages to minors and intoxicated individuals, and take such steps as are reasonably required to reduce the risk of intoxicated individuals leaving the premises from becoming a hazard to the public.

6.      Renter will make every reasonable effort to protect all structures, equipment, facilities, plantings, sod and artwork in the Park.  Further, Renter will make every reasonable effort to exclude violation or intrusion into the protected areas as described in Exhibit 3.

7.      All vehicle traffic shall be limited to routes designated in Exhibit 1 - Operation Procedures and Policies and shown in Exhibit 2 – TLP Site Plan Pathways.

8.      It shall be the Renter's responsibility to secure electrical, plumbing, carpentry and other services needed.  Any entity or person providing such services must be licensed, bonded and approved by Partnership at least fifteen (15) days prior to the Event.  Partnership shall request and use its best efforts to cause Montgomery Martin Construction, prior to the Event to (i) inspect all electrical outlets in the Park and repair any malfunctioning, inoperable, or damaged electrical outlets to the best of its ability.  Electrical service is subject to the City of Memphis Code Enforcement approval and MLGW action. In the event Partnership fails to deliver the Park with operational Electrical and Water Source necessary for Renter's event operations, Renter shall be discharged from Rental payment requirements.

9.      Renter shall provide such portable restrooms, security and/or traffic control as required for the Event or reasonably requested by Partnership.

6



10.    Renter shall provide for Emergency Medical support coverage during the Event in accord with standards recommended by City of Memphis Fire Services Division. Partnership assumes no responsibility for providing Emergency Medical Support coverage or security.

11.    The Park shall be policed for litter and Renter shall remove all litter and wooden pallets and empty all litter containers on a daily basis during its occupancy. Renter shall not allow the use of confetti or fireworks during any of its events unless pyrotechnic effects for on stage performances are approved by Memphis Fire Department. Renter shall ensure that it has installed the appropriate number of trash dumpsters for each of its events and shall not under any circumstances use trash dumpsters which are the property of Partnership or Montgomery Martin Construction. Renter covenants and agrees to quit and surrender the Park to Partnership at the end of the agreed term of occupancy in a like or similar condition as the date of commencement of this Agreement. Renter is responsible for all damages and vandalism occurring during event rental period subject to the Tom Lee Rental Agreement Section 3(b). Renter will be responsible at its expense and billed for the cost of repair and/or replacement of any and all damage/vandalism subject to the Tom Lee Rental Agreement Section 3(b).

A joint team of representatives from Partnership and Renter and the City appointed Neutral Third Party (the "Inspection Team") will conduct a walk-through inspection of the Park, guided by the Renter's operation plan provided by April 1,2023. Parties agree the operations plan may change and will work together to communicate such changes. Inspection Team will conduct pre-festival site inspection April 5, 2023, to document the Park condition prior to the event, and Renter will make adjustments to festival operation plan if needed. A subsequent walk-through will be done three days before the festival move-in to identify any new changes in the Park condition.

Within five (5) business days following the initial joint walk-through by the Inspection Team, Partnership shall document and provide to Renter in writing a copy of the results of the inspection (the "Initial Pre-Festival Inspection Report"). If Renter does not object to any provisions contained in the Initial Pre-Festival Inspection Report within three (3) business day following Renter's receipt thereof, Renter shall be deemed to consent to the terms of the Initial Pre-Festival Inspection Report. Renter shall notify Partnership within three (3) business day following Renter's receipt of the Initial Pre-Festival Inspection Report of any findings with which Renter does not agree, in which case, Renter and Partnership shall cooperate and use best efforts, within one (1) day following Renter's notice of objection, to identify and accurately document the Park conditions in question and shall jointly execute a final Initial Pre-Festival Inspection Report.

In the event parties do not agree with the Pre-Festival Inspection Report, the City of Memphis appointed Neutral Third-Party Arbiter shall make a binding determination to the Park condition prior to the event.

Under no circumstances may Renter occupy the Park prior to the execution of a final Pre-Festival Report.

7



Renter will vacate the Park in accordance with this Agreement, other than for purposes of inspection, repair, and restoration, at the conclusion of the Event.

Montgomery Martin Contractors and its subcontractors will be hired by the Partnership to repair and or replace any and all damages and vandalism. This repair/replacement work to restore the Park to pre-event condition provided in the **Initial Pre-Festival Inspection Report** will be completed at the Renter's expense subject to Tom Lee Park Rental Agreement section 3(b).

Due to issues of warranty all damage repairs including but not limited to rolling of turf, filling of ruts, and adding mulch must be done by Montgomery Martin. Renter must contact Partnership if it wishes to have any preventive work done before or between festivals that might reduce the negative impact of repeated overuse of the area that leads to increased restoration repairs. Immediately following the end of each Festival Event, the Renter shall undertake a comprehensive cleanup of the Park with particular attention given to small litter in the turf including, but not limited to, cigarette butts, beer caps and tabs, and plastic strapping. Vacuum equipment is required to accomplish this task. Renter shall leave the Park free of all trash and debris generated by its use of the Park. In the event the Park is not cleaned as required above, Renter shall pay Partnership on demand any costs incurred by Partnership required to return the condition of the Park to the conditions documented in the **Initial Pre-Festival Inspection** subject to Tom Lee Park Rental Agreement section 3(b).

On or about May 30, 2023, the **Inspection Team** (bold) will perform another walk-through inspection of the Park (the "**Post-Festival Inspection**") to jointly identify Park conditions after the Event. Within five (5) business days following the walk-through inspection, Partnership shall document and provide to Renter in writing a copy of the results of the inspection (**Post-Festival Inspection Report**). If Renter does not object to any provisions contained in the **Post-Festival Inspection Report** within three (3) business days following Renter's receipt thereof, Renter shall be deemed to consent to the details of the **Post-Festival Inspection Report**. If Renter objects to any provisions contained in the **Post-Festival Inspection Report Rent** shall notify Partnership within three (3) business days following Renter's receipt of the **Post-Festival Inspection Report** of any findings with which Renter does not agree, in which case, Renter and Partnership shall cooperate and use best efforts, within three (3) days following Renter's notice of objection, to identify and accurately document the Park conditions in question and shall jointly execute a final **Post-Festival Inspection Report** no later than June 19, 2023. In the event parties do not agree with the Post-Festival Inspection Report, the City of Memphis appointed Neutral Third Party Arbiter shall make a binding determination and shall notify the Parties and Escrow Agent within three (3) days.

The Partnership will provide the quote from Montgomery Martin Contractors for the work detailed in the **Post-Festival Inspection Report**, along with an invoice from the Partnership to Renter for the repair/replacement no later than June 26, 2023 Subject to Tom Lee Park Rental Agreement Section 3(b). Payment to be made 10 days after the Partnership has invoiced Renter.

12.    In the event the Park or any portion of the Park is not vacated by the Renter on the termination of the rental period described in the Agreement or in the event Renter or any agent, servant, employee, contractor, guest or invitee thereof shall leave any goods, wares, merchandise or property of any kind or description in the Park, Partnership shall be and is hereby authorized to

8



remove such items from the Park at the expense of the Renter without notice. Partnership shall not be liable for any damages/vandalism to or loss of such goods, wares, merchandise, or other property which may be sustained either by reason of such removal or the storage or disposal thereof. Renter shall hold Partnership harmless from any and all claims, liabilities, costs and damages/vandalism, including attorney's fees, of whatever kind or nature arising out of or in connection with the removal, disposal or storage thereof or Partnership will impose a late fee of $5,000.00 for each day the Park, or any part thereof, is occupied by the Renter. Any property left in the Park by the Renter, or any agent, servant, employee, contractor, guest or invitee thereof shall, after a period of seven (7) days from the last date of the Event, be deemed abandoned and become property of Partnership to be disposed of or utilized at Partnership's discretion.

13.    The pedestrian path from the Riverside Drive pedestrian bridge across Ashburn-Coppock Park to Martyrs Park is a primary public route to reach the Big River Crossing. Therefore, the Renter shall ensure uninhibited public access from the Riverside Drive pedestrian bridge across Ashburn-Coppock Park to Martyrs Park at all times. To provide connected access to the riverfront throughout the month of May, the Bluff Walk must remain open at all times during the Event rental period unless closed at the written direction of Memphis Police Department. Except on May 4, 2023 through May 8, 2023, the Renter shall not in any way hinder, inhibit or block the view of the public from the Bluff Walk. Hindering, inhibiting and blocking the view of the public would include, but is not limited to, the installation of screening and/or other materials on the fencing installed adjacent to the Bluff Walk.   Installation and takedown of all fenced areas must be on a schedule subject to the prior written approval of Partnership. Gates used at the Bluff Walk stairs to Tom Lee Park will be closed during the period of occupancy, except on event days when ticketed guests are admitted. Fencing must avoid all plantings and tree roots and may be attached to Bluff Walk railing with proper protection. Post holes for fencing made along top of Bluff must be filled with sand upon takedown of fencing. Wire clips or other connectors used to hold fence to post must be removed from the permanent railing, snow fencing and ground area upon removal of fencing.

14.    The Renter is responsible at its own costs for the installation of any temporary fencing, except for the fencing of the Restricted Area shown in Exhibit 3 – Restricted Area.

Fencing shown in Exhibit 5 for ticketed entry and exit to the Park in the vicinity of the Beale Street Landing facility for BSMF and the WCBCC shall be installed no earlier than twenty-four (24) hours prior to the start of each event and must be completely removed from the premises no later than seventy-two (72) hours after the conclusion of each event.

No changes will be made to the fencing plan shown in Exhibit 3 – Protected Area. Any significant changes to the fencing shown in Exhibit 5 and or as described herein must receive prior written approval from Partnership.

9



The Renter shall not drive any stakes or anchors into and/or penetrate by any means the asphalt or concrete surfaces and is responsible for all repair costs to utilities/irrigation system from any staking in the grass area.

Perimeter fencing must be removed by the end of the Event Period.

15.    The Renter shall not drive any stakes or anchors into and/or penetrate by any means the asphalt or concrete surfaces in Tom Lee Park, Ashburn-Coppock Park, Bluff Walk, Beale Street Landing or staircases at Vance, Huling, and Butler, or in any other rented areas. Renter agrees to use weights throughout the rented area when necessary.

16.    There are many new trees, shrubs, vines, ornamental grasses, ground cover, perennials, sod and other plants (Plantings) in Tom Lee Park. The Renter shall exercise extreme caution when working in the vicinity of these Plantings. The Renter shall be responsible for the repair (including replacement) of any damage/vandalism to these Plantings subject to Tom Lee Park Rental Agreement Section 3(b)

17.    During the term of this Agreement, timely and unimpeded access to the Beale Street Landing facility is critical for the Partnership and its tenants, contractors and employees. The Renter's staff and its contracted security personnel must provide this access. No vehicle access will be permitted to the Beale Street Landing facility on event days, specifically May 5-7, 2023 and May 17-20, 2023. Best efforts will be made by the Partnership to move overnight cruise ships to alternative Memphis dock locations. Prior to April 15, 2023, the Renter shall appoint a point of contact (POC) responsible for coordinating this access and the Renter shall provide the POC information to Partnership on or before this date. During the term of this lease, Partnership will coordinate directly with this POC to ensure the required access as stated above is provided. To the extent possible, Partnership will provide the POC in advance with the schedules of any events, boat dockings, vendors' deliveries or transportation buses coming to the Beale Street Landing facility. The POC will coordinate with other Renter staff and contracted security personnel to ensure timely and unimpeded access.

18.    Neither Partnership nor the City assumes any responsibility for any property of Renter, its agents, servants, employees, contractors, guests or invitees brought onto the Park, and PARTNERSHIP and the City are each hereby expressly released and discharged by Renter from any and all liabilities for any loss, injury, or damages/vandalism to persons or property that may be sustained by reason of the occupancy and use of the Park or any part thereof under this Agreement.

19.    Except for any loss caused by the gross negligence or willful misconduct of Partnership, or the City, the Renter shall indemnify and hold harmless Partnership, the City, and its subcontractors as appropriate, from all loss, cost and expense including, without limitation, attorney's fees arising out of any claims, damages/vandalism, liabilities, expenses and judgments or claim of liability for injury of or damage/vandalism to persons or property sustained or claimed

10

to have been sustained by Renter or any of its agents, servants, employees, contractors, guests or invitees by reason of the use or occupancy of the Park.

Renter agrees to obtain and deliver to Partnership at the time of acceptance and execution of this Agreement, or no later than thirty (30) days thereafter, a certificate of comprehensive general liability insurance, including personal injury, property damages/vandalism and liquor liability coverage, in a form and written by a company acceptable to and approved by Partnership, in an amount not less than One Million Dollars ($1,000,000.00) for injury or death of a single person, One Million Dollars ($1,000,000.00) for a single accident and One Million Dollars ($1,000,000.00) for property damage and automobile liability insurance with limits of One Million Dollars ($1,000,000.00) per occurrence, and an umbrella policy with limits of Five Million Dollars ($5,000,000.00) per occurrence and in the aggregate, such policies to be primary and non-contributory and, name as additional insured Partnership, the City and their officials and Board members. Such insurance shall be on an occurrence basis and be in effect with respect to the Event, together with such other endorsements which Partnership may require from time to time. Each certificate of insurance shall contain a valid provision of endorsement that the policy may not be canceled, terminated, changed, or modified without giving ten (10) days prior notice in writing to Partnership. Partnership and the City shall both be conspicuously named as additional insured in connection with such policies and each policy is issued on a primary and non-contributory basis. Renter shall also provide evidence to Partnership that Renter and each of its contractors maintain workers compensation insurance as required by law.

20. Renter hereby expressly waives any and all claims for compensation for any and all losses or damages sustained by reason of any defect, deficiency, failure or impairment of the water supply system, drainage system, or electrical system leading to or within the Park. In the event Partnership determines it is impractical to perform Partnership's obligations under this Agreement as a result of fire or other casualty or for any other reason whatsoever, including but not limited to, strikes, failures of utilities, or any act of God, the Renter hereby expressly releases, discharges, and will save harmless Partnership, the City and their agents, servants and employees from any and all demands, claims, actions, and causes of action arising out of any of the causes aforesaid.

21. Renter will pay all taxes in connection with this Agreement unless Partnership is provided a copy of Renter's valid Tennessee Tax Exemption Letter.

22. Renter must include all applicable terms of this Agreement in all agreements it has or makes with vendors or other parties with Partnership being named a beneficiary of such agreements when appropriate.

23. This Agreement shall be governed, construed and enforced according to the laws of the State of Tennessee. Accordingly, the parties to this Agreement submit to and understand that any and all legal actions shall be instituted and litigated in the Courts of the State of Tennessee located in Shelby County, Tennessee, and no other. If litigation ensues between the Partnership

11

and Renter, the prevailing party shall be entitled to its reasonable attorneys' fees, costs and expenses in enforcing its rights pursuant to the Agreement.

24.    Renter shall not assign this Agreement. Partnership understands that Renter engages in subletting areas of the Park to barbecue teams, concessionaires, sponsors and other third partied during the event period. This Agreement contains the entire agreement of the parties hereto with respect to the Event. No waiver of any right of any party hereto hereunder shall be valid unless in writing and signed by a duly authorized representative of such party.

27.    Event Coordinator: The Partnership will provide one or more Event Coordinators for Memphis in May 2023. The Event Coordinator will interface directly with Renter's manager on site in Tom Lee Park on a daily basis during the setup, Event days, and take-down and move-out.

- The purpose of designating an Event Coordinator is to act as a liaison for the Partnership to the Renter to coordinate the successful operation of the festival events at the venue, and to minimize damage to Tom Lee Park to, in order to restore Tom Lee Park to the pre-festival conditions, as quickly as possible, such as: electrical service, irrigation control boxes, irrigation heads, etc.

- The Event Coordinator will interface with a Renter-appointed representative to aid fence and tent contractors in determining fence and tent locations, looking primarily to identify any known utility location where post holes are driven. The Renter is ultimately responsible for locating any utilities and is responsible for repair costs to any damaged utilities as a result of Renter's activities.

28.    Neutral Third Party: The City of Memphis will appoint a Neutral Third Party to determine all damages and identify items to be repaired or restored. The Neutral Third Party will be part of the **Inspection Team** and shall participate in both the pre and post inspection walk through.

29.    The Partnership and Renter will be responsible for opening and closing of the Cutbank Bluff ADA gates, consistent with the hours other gates are open for entry or exit on May 5, 2023, through May 7, 2023, and on May 17, through May 20, 2023. Access to the Cutbank Bluff entrance and exit shall only be permitted for wheelchair persons along with one companion.

12



## Exhibit 1 – Operation Policy and Procedures

Following these guiding practices in no way eliminates or reduces the liability of Renter for damages.

There will be no early Event Set Setup, Event Load Out or Occupancy.

Vehicles and equipment must use Riverside Drive and appropriate pathways within the park rated for their use.

See attached TLP Site Plan Pathways.

1. The red highlighted pathway is a 12' wide heavy duty asphalt profile. This pathway can accommodate legal over-the-road trucks. This asphalt path is designed for 150,000 EASLs over a 20-year period (ESALs - Equivalent 18-kip Single-Axle Loads). The reference axle load is an 18,000-lb. single axle with dual tires.
2. The orange highlighted pathway is a 15' wide heavy duty concrete profile. This pathway is vehicular-rated and can accommodate legal over-the-road trucks. This concrete path is designed for 225,00 ESALs over a 20-year period (ESALs - Equivalent 18-kip Single-Axle Loads). The reference axle load is an 18,000-lb. single axle with dual tires.
3. The blue highlighted pathway is a 6' wide heavy duty asphalt profile.
4. The magenta highlighted pathway is a 10' wide heavy duty asphalt profile.
5. The yellow highlighted pathway is an 8' wide light duty asphalt profile.

The area under the Civic Canopy is constructed with the same vehicular paving profile of the 12' wide asphalt path (see 1 above) and is designed for 150,000 EASLs over a 20-year period.

All access to the Park from Riverside Drive, including but not limited to Renter's contractors and the contractor's subcontractors, Renter's subcontractors, barbecue teams, performers and their stage crew, all vendors regardless of nature, all transportations services, all security services regardless of nature, and all emergency services must use the mountable curb sections (along the west side of Riverside Drive) and use the appropriate pathways at all times during the rental period, including but not limited to pre-festival set up and post-festival strike and festival load-in and load-out. .

Renter will ensure the vehicle movement and all load-in and load-out plans are followed.

Renter agrees to survey all irrigation prior to laying out and set up the festival to minimize damage done to the system. Drawings of the irrigations system are provided in Exhibit 4 – Tom Lee Park Irrigation Plan and should be used to support the survey and not a substitution for the survey.

Where staking would likely damage irrigation lines, or other underground infrastructure, concrete weight must be used. When concrete weights are used appropriate protection of the lawn or other surface must be used.

~~Ground protection (plywood, event deck, etc.) or decking must be installed under each tent used during the festival.~~

Areas of the parks used for long term loading and/or staging or vehicles (car/trucks/over-the-road) must have ground protection (plywood, <u>event deck</u>, etc.) to reduce potential impacts to all surfaces including the ground surface.

Renter must monitor and protect the landscaping beds to ensure there is no pedestrian traffic in landscaping beds.

Renter must monitor and protect all areas closed for the festivals including the areas where there will be ongoing construction.

Renter will provide decking under the stage and BOH that protrudes onto the grass.

Renter will use decking along the pathways to extend the pathway width and protect sod and irrigation.

Renter must provide an environmentally safe way to safely dispose of grease and left-over food off-site.

Renter must provide a safe method of disposing charcoal and charcoal ashes off-site.

No fencing installed by the Partnership may be removed or moved by Renter.

Partnership will a protective covering to the Civic Canopy floor; however, Renter remains responsible for the protection of flooring and any damages/vandalism thereto.



Exhibit 2 · TLP Site Plan Pathways

Exhibit 3 - Protected Areas





Exhibit 3A

## IRRIGATION LEGEND

| | |
|---|---|
| ⋮ | SLEEVES CLASS 200 PVC |
| ⊢— | POINT-OF-CONNECTION ASSEMBLY |
| — | MAINLINE PIPE, CLASS 200 PVC SIZE AS INDICATED ON PLAN |
| — | LATERAL PIPE TO SPRINKLERS, CLASS 200 PVC 1-INCH SIZE UNLESS OTHERWISE INDICATED |
| —↑— | UNCONNECTED PIPE CROSSING |
| ▭ | RAIN DRIP TUBING RAIN BIRD XFCV6-18 WITH RAIN BIRD XQF DRIPLINE HEADER |
| ⊙ | REMOTE CONTROL VALVE ASSEMBLY FOR SPRINKLER LATERALS RAIN BIRD PER (SIZED PER PLAN) |
| ↘ | REMOTE CONTROL VALVE ASSEMBLY FOR SPRINKLER LATERALS RAIN BIRD 200 PB CP |
| ⊘ | REMOTE CONTROL DRIP VALVE ASSEMBLY RAIN BIRD XCZ 100-PRB-COM |
| ▪ | QUICK COUPLING VALVE ASSEMBLY RAIN BIRD SRC |
| ⋈ | ISOLATION GATE VALVE ASSEMBLY MATCO 10RT |
| ▣ | FLOW SENSOR ASSEMBLY RAIN BIRD FS200P |
| ▥ | BACKFLOW PREVENTION ASSEMBLY BY OTHERS |
| ▨ | WATER METER AND CURB STOP ASSEMBLY BY OTHERS |
| ⊕ | MASTER VALVE ASSEMBLY RAIN BIRD 200-GPEA |

INDICATES CONTROLLER AND STATION NUMBER
INDICATES LATERAL DISCHARGE (GPM)
INDICATES VALVE SIZE (INCHES)
INDICATES LANDSCAPE APPLICATION

| | |
|---|---|
| ⊛ | RAIN/FREEZE SENSOR RAIN BIRD WR2-RFC |
| Ⓒ | IRRIGATION CONTROLLER UNIT WITH RAIN SENSOR CONTROLLER A RAIN BIRD LXD CONTROLLER B RAIN BIRD LXD |
| ⊖ | INLINE TACE DRIP RING ASSEMBLY RAIN BIRD XFS-CV-09-12 |
| ⊙ ⊙ ⊙ | POP-UP SPRAY SPRINKLER RAIN BIRD RD1804-S-P30 W/U-SERIES 6 NOZZLE PRESSURE 30 PSI RADIUS 6 FEET FLOW (GPM) Q 0.76 H 0.52 F 1.03 |
| ⊙ ⊙ ⊙ | POP-UP SPRAY SPRINKLER RAIN BIRD RD1806-S-P30 W/U-SERIES 10 NOZZLE PRESSURE 30 PSI RADIUS 10 FEET FLOW (GPM) Q 0.41 H 0.82 F 1.64 |
| ▲ ▲ ▲ | POP-UP SPRAY SPRINKLER RAIN BIRD RD1806-S-P30 W/U-SERIES 12 NOZZLE PRESSURE 30 PSI RADIUS 12 FEET FLOW (GPM) Q 0.63 H 1.38 F 2.66 |
| ● ● ● | POP-UP SPRAY SPRINKLER RAIN BIRD RD1806-S-P30 W/U-SERIES 15 NOZZLE PRESSURE 30 PSI RADIUS 15 FEET FLOW (GPM) Q 0.92 H 1.81 F 2.70 |
| ▣ ▣ ▣ | POP-UP SPRAY SPRINKLER RAIN BIRD RD1806-S-P30 W/MPR SERIES NOZZLE PRESSURE 30 PSI RADIUS 4 FEET X 15 FEET FLOW (GPM) HEVAN06-1.17 HEVAN10-1.78 HEVAN12-2.37 HEVAN 3.76 |
| ▬ ▬ | POP-UP SPRAY SPRINKLER RAIN BIRD RD1806-S-P30 W/MPR SERIES NOZZLE PRESSURE 30 PSI RADIUS 4 FEET X 15 FEET FLOW (GPM) EST 0.61 EST 1.21 |
| ⊙ ⊙ ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12-PRS40-CV W/MP1000 NOZZLES PRESSURE 40 PSI RADIUS 8 FEET TO 15 FEET FLOW (GPM) M 0.42 L 0.63 O 0.84 |
| ⊙ ⊙ ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12-PRS40-CV W/MP2000 NOZZLES PRESSURE 40 PSI RADIUS 13 FEET TO 21 FEET FLOW (GPM) K 0.77 G-1.10 B 1.46 |

| | |
|---|---|
| ⊙ ⊙ ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12 PRS40 PRESSURE 40 PSI RADIUS 13 FEET TO 20 FEET FLOW (GPM) H-1.82 V-1.75 N 2.64 |
| ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12 PRESSURE 40 PSI RADIUS 21 FEET TO 15 FEET FLOW (GPM) 90°-1.28 180°-2.56 210°-2.75 |
| ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12 PRESSURE 40 PSI RADIUS 13 FEET TO 14 FEET FLOW (GPM) 45°-0.10 90°-0.20 105°-0.43 |
| ⊙ ⊙ ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12 PRS40 PRESSURE 40 PSI RADIUS ADJUSTABLE RECTANGULAR 1° FLOW (GPM) EST - 0.024-0.34 EST 0°-0.47 LCR/RCR 0.43 |
| ⊙ ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12 PRESSURE 40 PSI RADIUS 6 FEET TO 12 FEET FLOW (GPM) 90°-0.23 180°-0.42 210°-0.43 360° |
| ⊙ ⊙ ⊙ | POP-UP ROTATING SPRAY SPRINKLER HUNTER PROS-12 PRESSURE 40 PSI RADIUS 8 FEET TO 15 FEET FLOW (GPM) M-0.62 L-1.00 O-1.87 |

[remainder of legend illegible]

---

**TOM LEE PARK IRRIGATION PLAN**

Exhibit 5



**MEMPHIS RIVER PARKS
PARTNERSHIP**

40 S. Main Street, Suite 2800
Memphis, Tennessee 38103

August 2, 2023

Mr. Jim Holt
President and CEO
Memphis in May
56 South Front Street
Memphis, TN 38103

Jim,



Attached is Montgomery Martin Contractors' quote along with our invoice for damage repairs to Tom Lee Park. The invoice was prepared in accordance with the Tom Lee Park Rental Agreement Section 3(b).

The damages are based on the binding determination of the Neutral Third-Party Arbiter, and the cost to repair the damages is consistent with the contract prices contained in the Tom Lee Park construction contract between Memphis River Parks Partnership and Montgomery Martin, taking into consideration changes in current day costs in material and labor.

Please remit payment of the invoice no later than August 12 as required in section 11 of the TERMS AND CONDITIONS of the TOM LEE PARK RENTAL AGREEMENT dated March 3, 2023.

Art Davis
Chief Operating Officer / CFO
Memphis River Parks Partnership



EXHIBIT
2



Memphis River Parks Partnership

40 S Main St, Ste 2800
Memphis, TN 38103

901-312-9190
www.memphisriverparks.org

# Invoice

| Date | Invoice # |
|---|---|
| 8/2/2023 | 41826 |

**Bill To**

Memphis in May International
88 Union Avenue
Suite 301
Memphis, TN 38103

| P.O. No. | Terms | Due Date | Account # |
|---|---|---|---|
| | Net 10 | 8/12/2023 | |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| 2023 Festival Damage Repair / Replacement | | 1,425,366.00 | 1,425,366.00 |
| Credit for City of Memphis Invoice | | -350,000.00 | -350,000.00 |
| Credit for Memphis in May Escrow | | -250,000.00 | -250,000.00 |
| Credit for City of Memphis Invoice | | -150,000.00 | -150,000.00 |

| | |
|---|---|
| **Subtotal** | $675,366.00 |
| **Sales Tax (0.0%)** | $0.00 |
| **Total** | $675,366.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $675,366.00 |



# TLP Post Festival Damages

## Repair Estimate

*6/26/2023*



**MONTGOMERY MARTIN**
CONTRACTORS, LLC

| | FINAL DAMAGE EST. | Comments |
|---|---|---|
| Decks | 3,751 | |
| Riverside Drive Concrete and Asphalt | - | |
| Riverside Drive Storm Drain | 2,538 | |
| Civic Canopy Paint Touch Up | 1,132 | |
| Asphalt Pathways | 284,203 | |
| Plant Rail | 4,365 | |
| Site Electrical | 14,432 | |
| Landscape | 114,048 | |
| Sod | 177,067 | |
| Irrigation | 82,856 | |
| Park Fence | 9,185 | |
| Concrete Pathways | 525,069 | |
| **SUBTOTAL** | $ 1,218,644 | |
| General Conditions | 61,336 | |
| Project Requirements | 23,973 | |
| Fee and Insurance | 80,649 | |
| **SUBTOTAL** | $ 1,384,602 | |
| Design Expenses | 40,764 | |
| **TOTAL** | $ 1,425,366 | |



EXHIBIT
4

ELECTRONICALLY FILED
2023 Sep 08 3:48 PM
CLERK OF COURT - CIRCUIT

## IN THE CIRCUIT COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

RIVERFRONT DEVELOPMENT, INC.
d/b/a MEMPHIS RIVER PARKS PARTNERSHIP,

    **Plaintiff,**

**v.**
                           No.: CT-3703-23(Div. 9)

MEMPHIS IN MAY INTERNATIONAL
FESTIVAL, INC.,

    **Defendant.**

### COMPLAINT FOR BREACH OF CONTRACT

    Plaintiff Riverfront Development, Inc., d/b/a Memphis River Parks Partnership (the "Partnership"), for its Complaint for breach of contract against Defendant Memphis in May International Festival, Inc. ("MIM"), states as follows:

### INTRODUCTION

    The Partnership manages Tom Lee Park, along with an additional five miles of riverfront, under a Management Agreement with the City of Memphis. The Memphis Riverfront Concept was introduced in 2017 and called for, among other things, a significantly redesigned Tom Lee Park. The concept imagined the redesigned Tom Lee Park as an asset to match the majesty of our great river.

    In June 2022, the Partnership provided a detailed update to MIM board members and staff on the expected condition of the unfinished park as of May 2023 (including new, immature landscaping). The respective boards specifically discussed the damage that might result from MIM's use of the park before its completion and possible associated costs to repair those damages.



As detailed in the numbered paragraphs below, the Partnership and MIM engaged in extensive negotiations about MIM renting Tom Lee Park to hold the Beale Street Music Festival and World Championship Barbeque Cooking Contest during the month of May 2023. Ultimately, the Partnership and MIM entered into a contract for MIM's use of Tom Lee Park for these events that carefully and specifically delineated their respective responsibilities, including the responsibility for any damages caused to the park during MIM's events and how those damages would be determined. In fact, as a result of these negotiations and recognizing that the event would cause damage to the yet to be completed park, the City of Memphis agreed to appropriate $500,000.00 and Memphis in May escrowed $250,000.00 to pay for potential damages to Tom Lee Park. Moreover, realizing that this collective sum might not be sufficient to repair the damages caused by MIM's festivals, MIM agreed that it would be financially responsible for the cost of any repairs above the collective sum of $750,000.00. To date, MIM has refused to honor that agreement.

Damages resulting from Memphis in May's 2023 festivals included damage to lawns, landscaping, irrigation and walkways in a not-yet-complete Tom Lee Park, and the damages were extensive. The Partnership has repaired the damage caused by the MIM festivals and continues to pay for those repairs. The contract between the Partnership and MIM specified how the damages would be determined, **including the use of a neutral, third party, who was appointed by the City of Memphis,** to determine the nature and extent of the damage caused by the festivals. That process has been followed. To date, however, MIM has failed and refuses to pay the balance of repair costs resulting from its festivals. Because the Partnership has a duty to keep the parks out of a state of disrepair and to ensure that warranties related to the redesign remain in place, MIM's breach of the contract has forced the Partnership to advance the unpaid repair costs.

## PARTIES

1.      Plaintiff Riverfront Development, Inc. d/b/a Memphis River Parks Partnership (the "Partnership") is a nonprofit corporation organized under the laws of the State of Tennessee with its principal place of business located at 40 S. Main Street, Suite 2800, Memphis, TN 38103.

2.      Defendant Memphis in May International Festival, Inc., ("MIM") is a nonprofit corporation organized under the laws of the State of Tennessee with its principal place of business located at 56 S. Front Street, Memphis, TN 38103.

## JURISDICTION AND VENUE

3.      As set forth herein, both parties' principal place of business is in Memphis, Shelby County, Tennessee. In forming the contract at issue, the parties expressly submitted to the institution and litigation of "any and all litigation" in the "Courts of the State of Tennessee located in Shelby County, Tennessee, and no other. Further, the contract is governed by the laws of the State of Tennessee.

4.      Accordingly, jurisdiction and venue are appropriate in this court.

## FACTUAL ALLEGATIONS

5.      On or about August 30, 2022, the Partnership and MIM began negotiating terms for MIM's use of Tom Lee Park, Ashburn-Coppock Park and of adjoining properties for limited use, for the Beale Street Music Festival ("BSF") and World Championship Barbeque Cooking Contest ("WCB")(collectively "the Events").

6.      On or about November 18, 2022, the Partnership provided a proposed agreement to MIM for review and consideration.

7.      MIM provided a counter to the Partnership's proposed agreement on or about December 20, 2022.

3

8.    On or about December 28, 2022, Representatives of MIM and the Partnership communicated via email concerning outstanding matters to address in any final agreement.

9.    Over the course of the following two (2) months, the Partnership, MIM and representatives of the City of Memphis met and discussed proposed contract terms.

10.    On March 3, 2023, MIM and the Partnership executed an agreement titled, "Tom Lee Park Rental Agreement," which agreement is attached hereto as **Exhibit A** and incorporated herein by reference. (the "Agreement")

11.    The Agreement is subject to the Terms and Conditions attached thereto and incorporated therein. (the "Terms and Conditions") **Exhibit A, p. 2.**

12.    The Terms and Conditions provide for the use of "Tom Lee Park, Ashburn-Coppock Park and staircases at Vance, Huling and Butler.[sic], and the ADA ramp on the Cutbank Bluff for wheelchair access -only and only during ticketed entry hours (collectively the "Park") on May 5, 2023 through May 7, 2023, and on May 17, 2023, through May 20, 2023." **Exhibit A, p. 5.**

13.    The Terms and Conditions required MIM to "make every reasonable effort to protect all structures, equipment, facilities, plantings, sod and artwork in the Park" during the scheduled events. **Exhibit A., p. 6.**

14.    The Terms and Conditions required MIM to be "responsible for all damages and vandalism occurring during event rental period subject to the [Agreement] Section 3(b)." Section 3(b) of the Agreement required MIM to "establish an escrow account [] in the amount of $250,000.00 to serve as a Damages deposit to be used for the cost of repair or replacement of any and all damages...." with the only exceptions being the "City of Memphis shall be responsible to pay the first $350,00000 of such damages," if such damages were under $600,000.00, and the City

4

of Memphis being "responsible to pay up to an additional $150,000.00 for damages...," if in excess of $600,000.00. **Exhibit A, pp. 1-2.**

15. The Agreement expressly states that MIM "shall be responsible for damages in the excess of $750,000.00." *Id.*

16. The Agreement and its Terms and Conditions outlined an agreed process for determining the cost of damages to the Park arising from the Events. Specifically, the Agreement called for the City of Memphis to "appoint a Neutral Third Party to determine all damages and identify items to be repaired or restored..." ("Arbiter") **Exhibit A, pp. 2, 12.** The City appointed Alan Barner, President of MFA Program Management to serve as the Arbiter.

17. The Terms and Conditions required that a "joint team of representatives from Partnership and [MIM] and the City appointed Neutral Third Party (collectively the "Inspectors") [would] conduct a walk-through inspection of the Park, guided by [MIM's] operation plan..." and called for a "subsequent walk-through" to be conducted "three days before the festival move-in to identify any new changes in the Park condition." The Inspectors were then required to provide a report detailing the outcome of the inspection, giving MIM an opportunity to object. ("Pre-Event Inspection Report") This process also provided for the Arbiter to make a "binding determination to the Park condition prior to the event," in the event MIM and the Partnership were unable to agree on any objections. **Exhibit A., p. 7.**

18. MIM received the required Pre-Event Inspection Report on April 7, 2023. The report was detailed and precise, including photos and mapping. While MIM asked questions about the report, its representatives did not object by the April 12, 2023 objection deadline, and accepted the report on April 12, 2023.

19. MIM then received a report of the final pre-event inspection required three (3) days before the Events, on April 20, 2023. MIM did not object to the report.

5

20.     Subsequent to the event, the Inspectors were required to "perform another walk-through inspection of the Park [] to jointly identify Park conditions after the Event." The Inspectors were then required to provide a report detailing the outcome of the post-event inspection, giving MIM an opportunity to object. ("Post-Event Inspection Report") This process also provided for the Arbiter to make a "binding determination and [] notify [MIM and the Partnership] and Escrow Agent...," in the event MIM and the Partnership were unable to agree on any objections as to the Park's condition post Events. **Exhibit A., p. 8.**

21.     MIM received the required Post-Event Inspection Report on May 31, 2023. The report was detailed and precise, including photos and mapping. MIM raised fifty-nine (59) objections to the report on June 5, 2023. The Partnership agreed with six (6) of MIM's objections, leaving fifty-three (53) for review by the Arbiter. The Arbiter reviewed and opined on the report and MIM's remaining fifty-three (53) objections.

22.     The Arbiter provided his binding determination on June 15, 2023, wherein he agreed with nineteen (19) of MIM's objections and overruled thirty-four (34) of MIM's objections. The Arbiter ultimately affirmed two hundred fifty-two (252) instances of damage resulting from the Events. The Arbiter's binding determination is attached hereto as **Exhibit B.**

23.     Under the Terms and Conditions, the Partnership was required to provide MIM with a quote for the damage repair outlined in the Post-Event Inspection Report, "along with an invoice from the Partnership to [MIM] for the repair/replacement..." with payment due ten (10) days after the date of the date the invoice; and, with "amounts unpaid after due date" bearing "interest at 9% annum." **Exhibit A., pp. 2, 8.**

24.     As required by the Agreement and its Terms and Conditions, the Partnership provided MIM with Montgomery Martin's quote for the damage repairs deemed necessary by the Arbiter and an invoice for those damage repairs. *See* **Exhibit C.**

6

25.    The total damage repair cost because of the Events was $1,425,366.00.

26.    The invoice provided to MIM itemized credits for payments from the City of Memphis and money held in escrow for damages to the Park, reducing the total amount due to the Partnership from MIM to $675,366.00. ("Balance of Repair Costs")

27.    Under the Agreement and its Terms and Conditions, MIM was required to remit a payment of $675,366.00 to the Partnership by August 12, 2023.

28.    To date, MIM has failed to pay the Balance of Repair Costs.

29.    The Partnership, having a duty to keep the Park out of a state of disrepair and to ensure that it keeps applicable warranties in place, has advanced damage costs owed by MIM to permit repairs to move forward.

## CAUSE OF ACTION
### (Breach of Contract)

30.    The Partnership incorporates paragraphs 1-29 here as if set forth in their entirety herein.

31.    The Partnership entered into a contract with MIM for the lease of the Park for the Events under terms set forth in the Agreement.

32.    The Partnership has performed as required under the Agreement.

33.    The Partnership invoiced MIM for damages to the Park in excess of $750,000.00, in accordance with the terms of the Agreement.

34.    MIM failed to timely pay the invoice from the Partnership for the damages to the Park exceeding $750,000.00.

35.    MIM, in failing to timely remit payment of the invoiced amount, has materially breached the Agreement.

36.    MIM's material breach has damaged the Partnership in an amount not less than $675,366.00, plus interest at the contractual rate of 9% per annum.

7

37.   The Partnership has been required to incur attorneys' fees because of MIM's failure to pay the invoiced amount.

## DAMAGES

38.   The Partnership incorporates paragraphs 1-37 here as if set forth in their entirety herein.

39.   MIM's material breach has damaged the Partnership in an amount not less than $675,366.00, plus interest at the contractual rate of 9% per annum.

40.   The Partnership seeks pre- and post-judgment interest on the outstanding debt, and reimbursement of attorneys' fees pursuant to the Agreement.

## RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following:

a.   That all necessary process issue;

b.   That upon a hearing of this cause, the Partnership recover a Judgment against MIM in an amount to be determined at trial, but in no event less than $675,366.00, plus interest at the contractual rate of 9% per annum, plus costs, post-judgment interest, and reimbursement of attorneys' fees pursuant to the Agreement;

c.   That the Partnership be awarded any and all other relief to which it may be entitled, legal and equitable; and

d.   That costs be assessed against the Defendant.

Respectfully submitted,

Tannera George Gibson (#027779)
Jonathan P. Lakey (#016788)
Burch, Porter & Johnson, PLLC
130 North Court Avenue
Memphis, Tennessee 38103
Phone: (901) 524-5000
Fax: (901) 524-5024

8

E-mail: tgibson@bpjlaw.com
          jlakey@bpjlaw.com

*Attorneys for Riverfront Development, Inc.*
*d/b/a Memphis River Parks Partnership*

9

# LAW OFFICES OF LIBBY & NAHMIAS

*Admitted in Tennessee,
Mississippi and Arkansas

5384 Poplar Ave., Suite 410
Memphis, Tennessee 38119

Telephone: (901) 343-0777
Facsimile: (901) 343-0780

Attorneys & Mediators

Stephen F. Libby, Esq.*
Adam M. Nahmias, Esq.

steve@lnlawmemphis.com
adam@lnlawmemphis.com

November 16, 2023

**Via Email (mthompson@americanspecialty.com) & Certified Mail**
Mr. Mark J. Johnson
EVP and Chief Claims Officer
American Specialty Insurance and Risk Services Inc.
7609 West Jefferson Blvd., Suite 100
Fort Wayne, Indiana 46804

|  |  |
|---|---|
| Our Client: | Memphis in May International, Inc. |
| Policy No.: | SMCGL3628400 |
| Claim No.: | 51586000101 |
| Case: | Riverfront Development, Inc. v. Memphis in May International, Inc. Shelby County Circuit Court Docket No. CT-3703-23 |

Dear Mr. Johnson:

This firm represents Memphis in May International, Inc. ("**MIM**") in connection with the above-referenced Policy, Claim and Case. My client has provided me with a copy of your letter dated October 13, 2023, in which American Specialty Insurance and Risk Services, Inc. ("**AS**") denied any coverage under the Policy that was issued to MIM by Arch Insurance Company (for purposes of this letter, any and all references to AS shall be been deemed to include Arch).

This letter shall serve as MIM's formal response to your letter, and its final demand that my client be afforded all rights to which it is entitled under the Policy, and including but not limited to being provided a defense and indemnity in connection with the Case. Based on your letter, AS is already in possession of a copy of the Complaint filed in the Case by Plaintiff Riverfront Development; Inc. d/b/a Memphis River Parks Partnership (the "**Partnership**"). As you are aware, the Litigation arises out of certain claims asserted in the Litigation by the Partnership arising out the "Tom Lee Park Rental Agreement" between MIM and the Partnership dated March 3, 2023, a copy of which is attached to the Complaint as Exhibit A (the "**Agreement**").



## The Policy, Extensions and Endorsements

As reflected on the Certificate for the Policy, it was issued on March 2, 2023, one day before MIM and the Partnership signed the Agreement. In addition to the coverage afforded by the CGL portion of the Policy, the Policy also included an "Additional Coverage Endorsement," a "Liability Extension Endorsement," and an Excess Liability Policy. Needless to say, these Endorsements and Excess Policy were purchased for the express purpose of insuring that MIM had sufficient insurance in the event of any damage(s) arising out of or relating to MIM's use of the properties for the events described in the Agreement.

In order to insure that it had sufficient insurance, MIM's agent, World Insurance Associates, LLC, provided AS with a copy of the Agreement, and all pertinent information regarding the two events for which MIM was purchasing said insurance---the Beale Street Music Festival (the "**Festival**") and the World Championship Barbecue Cooking Contest (the "**Contest**")---prior to the Policy being issued.

## AS Position on Coverage

In your letter, AS appears to acknowledge and agree: **(a)** that the "claimed property damage" sought by the Partnership "occurred during the policy period."; **(b)** that the "claimed property damage" occurred during the relevant policy period; **(c)** that the damages were caused by "crowds of people" that attended the Festival and Contest, "and therefore constitute an 'occurrence' under this Policy."; and **(d)** that there was "physical injury to tangible property, which was the result of an accident, or at a minimum, continuous and repeated exposure to substantially the same general harmful conditions." See October 31 Letter, at pp. 6-7.

After acknowledging that the Policy "initially" provides "limited" coverage for the claimed property damages, AS contends that said damages are nonetheless excluded by the "Damage to Property" exclusions set forth in Section I 2(j)(1) of the Policy (the "**(j)(1) Exclusion**") and that none of the "exceptions" to said exclusions set forth at the end of Section I 2(j) are applicable (the "**Exception**"). AS also contends that there is no coverage for the claimed damages under the Additional Coverage and/or Liability Extension Endorsements (collectively the "**Extension Endorsements**"), which provide, among other things, that the exclusions set forth in Section I 2(c)-(n) of the Policy (which includes the (j)(1) Exclusion) do not apply to "damage to premises rented to you, or temporarily occupied by you, with permission of the owner, caused by fire, riot or civil commotion, **vandalism**. . . ." See Letter at p. 9 (Emphasis supplied).

According to AS, the applicability of the Exceptions (and specifically the first listed exception) hinges "on the duration of the rental period of the Park, as established in the Rental Agreement." According to the first listed exception, the (j)(1) Exclusion does not "apply to 'property damage' (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days." See Letter at p. 9

2

You cite several authorities that discuss the definition of "rent" for purposes of a CGL policy, and conclude that "payment for use or payment for occupancy constitute rent," and that "when the right of use or right of occupancy is set forth in a contract. . . it will constitute rent." For these reasons, AS concludes that "the exception to exclusion (j)(1) is inapplicable, and exclusion (j)(1) should exclude coverage in this matter." See Letter, pp. 10-12. With respect to the applicability of the Extension Endorsements, AS contends that "none of the claimed property damages trigger" said Endorsements. See Letter, at p. 9.

As set forth below, the positions taken by AS are not supported by Tennessee law and ignore the allegations in the Complaint. Even assuming the (j)(1) Exclusion is triggered in connection with the damages being sought in the Case, both the Exceptions to this Exclusion and the Extension Endorsements  provide coverage to MIM under the Policy.

## The Complaint

AS repeatedly cites from the Terms and Conditions of the Agreement to support its contention that the damages sought in the Case arose out of property "rented" by MIM, while ignoring the actual allegations in the Complaint regarding said damages.  The law in Tennessee is well settled that As stated in "whether a duty to defend arises depends **solely on the allegations contained in the underlying complaint. . . ."** Travelers Indem. Co. of Am. v. Moore & Associates, Inc., 216 S.W.3d 302, 305 (Tenn. 2007)(Emphasis supplied).

The "Introduction Section" of the Complaint states that MIM and the Partnership "entered into a contract for MIM's use of Tom Lee Park **for these events** that carefully and specifically delineated their respective responsibilities, including the responsibility for **any damages caused to the park to during MIM's events** and how those damages would be determined." See Complaint, at Introduction (Emphasis supplied).

According to paragraph 5 of the Complaint, MIM and the Partnership began negotiations for the use of "Tom Lee Park, Ashburn-Coppock Park and of adjoining properties **for limited use,** for the Beale Street Festival and World Championship Barbecue Cooking Contest. . . ." See Complaint, at ¶ 5.  The Rental Agreement is summarized by the Partnership in paragraph 12 of the Complaint, which states as follows:

> The Terms and Conditions provide for the use of "Tom Lee Park, Ashburn-Coppock Park and staircases at Vance, Huling and Butler and the ADA ramp on the Cutbank Bluff for wheelchair access-only **and only during ticketed entry hours (collectively the "Park") on May 5, 2023 through May 7, 2023, and on May 17, 2023, through May 20, 2023."** Exhibit A, p. 5.

See Complaint, at ¶ 12 (Emphasis supplied).

According to paragraph 14 of the Complaint, the Agreement "required MIM to be 'responsible for all **damages and vandalism** occurring during event rental period subject to the [Agreement] Section 3(b)." See Complaint, at ¶ 14 (Emphasis supplied).

3

The foregoing allegations make it clear that: (a) the Partnership granted MIM the right to a **"limited use"** of multiple properties owned or controlled by the Partnership, and including the two "Parks" identified in paragraph 12, multiple staircases and an ADA ramp; (b) the limited use granted by the Partnership was only granted during the "ticketed entry hours" and only for the Festival and Contest; (c) the limited use granted by the Partnership was from May 5-May 7, 2023 for the Beale Street Festival and May 17-May 20, 2023 for the Barbecue Cooking Contest the MIM events were not "rented" to MIM for "seven consecutive days; and (d) MIM was responsible for "all damages and vandalism" that took place during the Festival and Contest.

With respect to the damages being sought by the Partnership, paragraph 14 of the Complaint alleges that the Agreement "required MIM to 'be responsible for **all damages and vandalism** occurring during event rental period. . . .'" According to paragraph 22, the arbiter that the parties hired to evaluate the damage following the Festival and Contest (pursuant to the Agreement) "ultimately affirmed two-hundred fifty-two (252) instances of damage **resulting from the Events.**" In paragraph 25, the Partnership alleges that the "total damage repair cost **because of the Events** was $1,425,366.00, and paragraph 26 confirms that while some portion of the total repair cost has been paid, MIM remains liable for the "Balance of Repair Costs" (as defined in the Complaint) in the sum of $675,366.00.

### The Damage to Property and (j)(1) Exclusion

AS correctly states that no court in Tennessee has squarely addressed the (j)(1) Exclusion (or the Exceptions thereto), but several have addressed the underlying intent of CGL policies, from the perspective of both insurer and insured, and including the Eastern District of Tennessee in Auto-Owners Ins. Co. v. Southeastern Car Wash Sys., 184 F. Supp. 3d 625 (E.D. Tenn. 2016). In that the case, the court had to determine what portions of a claim filed by a car wash manufacturer were covered under the CGL policy in that case. Id. at 627.

The Auto Owners court first recognized that the "eight corner rule" of policy interpretation as follows:

> As the name of the rule suggests, only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the underlying claimant. . . If the four corners of a [complaint] allege facts stating a cause of action which potentially falls within the four corners of the policy's scope of coverage, the insurer has a duty to defend. If all the facts alleged in the underlying [complaint] fall outside the scope of coverage, then there is no duty to defend"

Id. at 628 (citing Liberty Mut. Ins. Co. v. Graham, 473 F.3d 596, 599 (5th Cir. 2006). The court also made the following observations regarding the insuring agreement:

> The insuring agreement states that Auto-Owners will defend Miller against suits seeking "damages *because of . . .* 'property damage.'" (*See id.* at 70; § I.A.1.a.) "Because of" is not defined in the Policy, so it must be given its ordinary meaning. See Tenn. Farmers Mut. Ins. Co. v. Davis,, 1987 Tenn. App. LEXIS 3085, 1987 WL 20188, at *2 (Tenn. Ct. App. Nov. 25, 1987). Webster's

4

Dictionary defines "because of" to mean "by reason of" or "on account of." Webster's Third New International Dictionary 194 (1993). These definitions communicate the idea of a causal relationship; that something follows as a consequence of something else. . . .

Auto-Owners, 184 F.Supp.3d at 631.

In holding that the insureds' claims for damage to the car wash, lost profits from the loss of use of the carwash and the payment of customer claims whose cars were damaged by the carwash constituted "property damage" recoverable under the policy in that case, the Auto-Owners court observed that "numerous other courts have held that the phrase 'because of . . . property damage' in the insuring agreement **extends coverage for consequential damages arising in the wake of physical damage."** Id (Emphasis supplied). See also Dewitt Constr. Inc. v. Charter Oak Fire Ins. Co., 307 F.3d 1127, 1136 (9th Cir. 2002), ("[I]ntangible economic injuries may result from physical injury to tangible property and such injuries are recoverable if they flow directly from the property damage"); Nautilus Ins. Co. v. ABN-AMRO Mortgage Grp., Inc., 2006 U.S. Dist. LEXIS 88932, at *6 (S.D. Tex. Dec. 8, 2006) ("The plain meaning of ['damages because of . . . property damage'] is that all damages caused by 'property damage' are covered by the policy."); Minn. Mining & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 182 (Minn. 1990) ("Damages which are causally related to covered 'property damage' should also be covered under the language of the policy."); Federated Mut. Ins. Co. v. Concrete Units, Inc., 363 N.W.2d 751, 757 (Minn. 1985) ("[T]he most sensible reading of the . . . phrase, 'damages because of . . . property damage,' requires the insurer to pay all damages which are causally related to an item of 'property damage' which satisfies either of the policy's definitions [of property damage]."); Marley Orchard Corp. v. Travelers Indem. Co., 750 P.2d 1294, 1297 (Wash. Ct. App. 1988) (holding that the language "damages because of . . . property damage" in a CGL provides coverage for consequential damages; i.e., damages causally related to the property damage").

The damages being sought by the Partnership include the cost to repair and replace certain damaged property at the locations utilized for the Events. As shown below, and because the Complaint seeks damages that were allegedly sustained "because of" MIM's limited use of the properties during the Festival and Contest, such damages "are within the risk covered by the insurance contract and for which there is a potential basis for recovery. . . ," AS's duty to defend MIM in the Case, at a bare minimum, has been triggered. See Travelers Indem. Co. of Am. v. Moore & Associates, Inc., 216 S.W.3d 302, 305 (Tenn. 2007).

In addition to the foregoing, MIM contends that both or either of the Exceptions to the (j)(1) Exclusion and the Extension Endorsements also provide coverage under the Policy.

### Coverage under the Exceptions

AS's position that the damages being sought in the Case are excluded under the (j)(1) Exclusion is based on a strained interpretation and definition of the term "rent" that is simply not applicable to the facts in this case. This same interpretation is used to defend AS's position that the first exception to the (j)(1) Exclusion does not apply because the "rental period" for MIM's

5

limited use of the Partnership's property to conduct the Festival and Contest was not for a period of "seven or few consecutive days." See Letter, at p. 8.

As stated in your letter and as recognized by the court in Charter Oak Fire Ins. Co. v. Coleman, 273 F.Supp.2d 903 (W.D. Ky 2003), the "primary function" of the rent or own exclusion is to **"prevent the insured from using a liability insurance policy as if it provided property insurance" and insulate against the 'moral hazard' problem where an insured has less incentive to take precaution owing to the existence of insurance."** Id. at 912. In Coleman, the issue was whether the insured actually occupied a portion of the insured building, since the insurance company in that case was "liable only for the damages to portions of the building which [the insured] does not occupy. Id. at 913.

In the case at hand, MIM had every incentive and took every precaution to protect itself against liability in connection with its limited use of the properties for the Festival and Contest. Indeed, the decision in Charter Oak is like the others cited or relied upon by AS to support its position, namely that the insured party actually occupies and uses a structure or building or is party to an agreement allowing for said use and/or occupancy.

The only other case cited in support of AS's position that the (j)(1) Exclusion is applicable to the damages sought by the Partnership in the Litigation, Argonaut Great Cent. Ins. Co. v. Bruxie, LLC, 2015 WL 12765015 (C.D. Cal. 2015), involved damage resulting from the intentional theft of fixtures from a building that the insured was renting pursuant to a ten-year lease. Id. at *7-8. In fact, none of the authorities cited involve CGL policies or facts even close to those in the case at hand. Great-W Life & Ann. Assur. Co. v. Parke Imperial Canton, Ltd., 177 B.R. 843 (N.D. Ohio 1994) was a bankruptcy case that involved a dispute over a security interest in rental proceeds, while London Computer Sys., Inc. v. Zillow, Inc., 2020 WL 5366108 (S.D. Ohio 2020) dealt with the propriety of a preliminary injunction in a trademark case.

The term "rent" is not defined the Policy, nor is it mentioned in the Complaint. As stated in Tennessee Farmers Mut. Ins. Co. v. Estate of Cossitt, 2016 LEXIS 984 (Tenn. Ct. App. Dec. 21, 2016), the primary goal of a court is "to ascertain and give effect to the parties' intent. . .[and[ the court should look first to the plain language of the policy and give the words used their usual and ordinary meaning." Id. at *7. The Cossitt court continued that "ordinary meaning contemplated is 'the meaning which the average policy holder and insurer would attach to the policy language,'" and "[t]he language of an insurance contract 'must be read as a layman' would read it.'" Id. See also Harrell v. Minn. Mut. Life Ins. Co., 937 S.W.2d 809, 814 (Tenn. 1996) ("[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy.").

While AS devotes a great deal of attention to analyzing the various terms and conditions of the Agreement, MIM was far from the typical insured who purchases a general liability policy to protect against damage arising out of its use a piece of building or structure. It was therefore far from a typical "tenant," and at least once court has recognized that "arrangements between landowners and those who conduct commercial operations upon their land are so varied that it is **increasingly difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as "leases," "easements," "licenses," "profits," or some other obscure interest**

6

in land devised by the common law in far simpler times." Golden W. Baseball Co. v. City of Anaheim, 31 Cal. Rptr. 2d 378, 395 (Cal. Ct App. 1994)(Emphasis supplied).

As stated in Lange v. Sullivan, 2019 LEXIS 223 (Tenn. Ct. App. 2019), a "'license' with respect to real estate, is an authority to do a particular act or series of acts on another's land without possessing any estate therein. . . . [and] is generally revocable at the will of the licensor." According to the Lange court, "a license generally does not create an interest in land," and "Tennessee Courts have uniformly held that licenses create no interest in real property." Id. at *7 (Citations omitted, emphasis supplied).

Based on the allegations in the Complaint, MIM had no interest in the multiple properties, staircases and a loading dock for which it was granted a "limited use" for the Festival and Contest on "non-consecutive" weekends. To the contrary, the Partnership and MIM specifically expressed their intent in the Agreement that MIM was only being granted a "limited" right to use these properties, and only for the time periods and for the events set forth in paragraph 12 of the Complaint. The time periods set forth in said paragraph are not consecutive, nor do they exceed seven days.

Under Tennessee law (and the terms of the Agreement itself), MIM is a licensee, rather than a tenant of the Partnership. For that reason, MIM contends disputes that the damages being sought in the Case do arise out of or relate to property that MIM "owns or rents." Nevertheless, and even assuming applicability of the (j)(1) Exclusion (which is denied), the Exception to this Exclusions is clearly applicable based on the allegations in the Complaint.

## Coverage under the Extension Endorsements

According to the Extension Endorsements, the (j)(1) Exclusion "does not apply to damages to premises while rented to you, **or temporarily occupied by you with permission of the owner**," caused by multiple different events, including "vandalism" and "civil commotion." (Emphasis supplied). As with the term "rent," the Policy does not define the terms "vandalism" or "civil commotion." Tennessee courts must therefore analyze those terms "as would a layman." Harrell v. Minn. Mut. Life Ins. Co., 937 S.W.2d 809, 814 (Tenn. 1996).

In Southern Trust Ins. Co. v. Phillips, 474 S.W.3d 660 (Tenn. Ct. App. 2015), the court had to determine whether arson could be considered "vandalism" or "malicious mischief" under the CGL policy in that case. The court engaged in a lengthy analysis of the various definitions of these terms throughout the country, ultimately concluding as follows regarding the term "vandalism":

On appeal, Southern Trust asks us to consider and apply the dictionary definitions of vandalism and malicious mischief in order to determine whether arson qualifies as either. Southern Trust cites *Black's Law Dictionary*, which defines vandalism as:
**1. Willful or ignorant destruction of public or private property, esp. of artistic, architectural, or literary treasures. 2. The actions or attitudes of one**

7

**who maliciously or ignorantly destroys or disfigures public or private property; active hostility to anything that is venerable or beautiful.** *Black's Law Dictionary* (10th ed. 2014). . . .The terms vandalism and malicious mischief are broadly defined in Merriam-Webster's Collegiate Dictionary. The full definition of "vandalism" is the "willful or malicious destruction or defacement of public or private property." 1 June 2015. <http://www.merriam-webster.com/dictionary/vandalism >, (based on the print version of *Merriam-Webster's Collegiate Dictionary*, Eleventh Edition). . . .

Id. at 667-68 (Emphasis supplied).

The Complaint specifically states that MIM was responsible for "all damages **and vandalism.**" See Complaint, at ¶ 24 (Emphasis supplied). It likewise alleges that "two hundred fifty-two (252) **instances of damage** resulting from the Events." See Complaint, at ¶ 22 (Emphasis supplied). It does not state how or under what circumstances said "instances of damages" were created or caused, but it is more than reasonable to assume that some, all or portions of said damages were created or caused by third parties who attended the events and engaged in the "willful or ignorant destruction of private property," the "malicious or ignorant" destruction or disfigurement of "public or private property," and/or were "actively hostile" to any of the properties for which MIM was granted a limited use.

Based on the foregoing, and when construed liberally in favor of MIM, coverage for the damages sought by the Partnership in the Case is also provided under the Extension Endorsements.

### Duty to Defend and Indemnify

As stated in Travelers Indem. Co. of Am. v. Moore & Associates, Inc., 216 S.W.3d 302, 305 (Tenn. 2007), commercial general liability policies are "designed to protect an insured against certain losses arising out of business operations." The law in Tennessee is well settled that any ambiguities in an insurance policy are construed in favor of the insured. Griffin v. Shelter Mut. Ins. Co., 18 S.W.3d 195, 200 (Tenn. 2000). Tennessee law likewise provides that an insurers' duty to defend is broader than the duty to indemnify, and that an insurer bears the burden of establishing the applicability of any exclusions to coverage. Charles Hampton's A-1 Signs, Inc. Am. States Ins. Co., 225 S.W.3d 482, 487 (Tenn. Ct. App. 2006).

As stated in Moore, "whether a duty to defend arises depends **solely on the allegations contained in the underlying complaint. . . .**" Accordingly, continued the Moore court, "an insurer has a duty to defend when the underlying complaint alleges damages that are within the risk covered by the insurance contract **and for which there is a potential basis for recovery.**" Moore, 216 S.W.3d at 305 (Emphasis supplied). Indeed, the "duty to defend arises **if even one of the allegations** is covered by the policy. . . and [a]ny doubt as to whether the claimant has stated a cause of action within the coverage of the policy **is resolved in favor of the insured**" Id. (Emphasis supplied); See also Triangle Ins. Co. v. Resolute FP US, Inc., 2021 LEXIS 125813 (E.D. Tenn. 2021); Drexel Chem. Co. v. Bituminous Ins. Co., 933 S.W.3d. 471, 480 (Tenn. Ct. App. 1996). Griffin v. Shelter Mut. Ins. Co., 18 S.W.3d 195, 200 (Tenn. 2000)(general liability policies are "designed to protect an insured against certain losses arising out of business

operations."); Charles Hampton's A-1 Signs, Inc. Am. States Ins. Co., 225 S.W.3d 482, 487 (Tenn. Ct. App. 2006)(holding that any ambiguities in an insurance policy are construed in favor of the insured, and that the duty to defend is broader than the duty to indemnify).

In addition to the foregoing, and as stated by the Tennessee Supreme Court in Alcazar v. Hayes, 982 S.W.2d 845 (Tenn. 1998), "courts do not shut their eyes to realities; they know that the policy is a contract of 'adhesion,' i.e. not one which the parties have reached by mutual negotiation and concession, not one which truly expresses any agreement at which they have arrived, but one which has been fixed by the insurer and to which the insured must adhere, if he chooses to have insurance." Id. at 851-852. For these reasons, courts in Tennessee "attempt to construe insurance contracts so as to provide coverage. Id. at 852.

Finally, and while the facts are still being developed, AS may be estopped to deny coverage under the Policy since they had actual knowledge of the terms of the Agreement and potential damages to which MIM was exposed thereunder. In fact, it is my understanding that MIM purchased the Excess Policy and the Extension Endorsements to protect itself against the very damages being sought in the Complaint, and that AS had actual knowledge of that fact. See Bill Brown Constr. Co. v. Glens Falls Ins. Co., 818 S.W.2d 1, 4 (Tenn. 1991)(holding that insured cannot "expand coverage," but may be entitled to coverage based on the acts and representations of an insurer.).

### Conclusion

Based on the foregoing principles, if even one of the allegations in the Complaint is covered by the Policy, and at a bare minimum, AS has a duty to defend MIM in the Case. For the reasons set forth above, MIM disputes that the (j)(1) Exclusion is applicable since it was never "renting" anything from the Partnership. As alleged in the Complaint and Agreement, it is undisputed that MIM was given the right to the "limited use" of the Partnership properties to conduct the Festival and Contest over two separate weekends. Even if the (j)(1) Exclusion is found to be applicable, however, MIM did not "rent" the properties for more than "seven or fewer consecutive days," and the Exception to this Exclusion provides coverage. Finally, and because the damages being sought in the Case arose out of "vandalism" and/or "two-hundred fifty-two (252) instances of damage resulting from the Events" that could have been caused, in whole or part, by vandalism, the Extension Endorsements likewise provides coverage under the Policy.

This letter shall serve as MIM's final demand, pursuant to the relevant provisions of Tenn. Code Ann. §56-7-105(a), that MIM be afforded all rights under the Policy, and including but not limited to AS providing MIM with a defense in connection with the Case, and for indemnity against any judgment that may be rendered against MIM in connection therewith.

As time is of the essence, please advise of AS's position as soon as possible.

Sincerely,

THE LAW OFFICES OF LIBBY & NAHMIAS

Adam M. Nahmias

Cc:    Memphis in May International, Inc.

10