IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

| | |
|---|---|
| MEMPHIS IN MAY INTERNATIONAL FESTIVAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> ARCH INSURANCE COMPANY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 2:24-cv-02327-SHM-tmp<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Before the Court is Defendant Arch Insurance Company's ("Arch") Motion for Summary Judgment. (ECF No. 33.) For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

I.   **Background**

The following factual background is undisputed unless otherwise noted. Plaintiff Memphis in May International Festival, Inc. ("MIM") has owned and operated the Beale Street Music Festival ("Festival") and World Champion Barbecue

Competition ("Competition") (collectively "Events") in Memphis, Tennessee, since the 1970s. (ECF No. 36 ¶ 1.) MIM contracted with the Memphis River Parks Partnership ("MRPP") for a venue to hold the 2023 Festival and Competition. (Id. at ¶ 2.) The parties executed the Tom Lee Park Rental Agreement ("Park Agreement") on March 3, 2023, which designated Tom Lee Park, Ashburn-Coppock Park, and surrounding staircases as the places MIM would use to host the Events (collectively referred to as "the Park"). (Id. at ¶¶ 2-3.) The Park Agreement included a section allocating responsibility to pay for damage to the Park that might arise during the period MIM would use the Park.[1] (Id. at ¶ 6.) The City of Memphis would pay the first $350,000 in damages. (Id.) MIM agreed to place money into an escrow account to pay for the next $250,000 in damages. (Id.) If damages exceeded $600,000, the City of Memphis would pay an additional $150,000 in damages. (Id.) MIM agreed to be responsible for all damages exceeding $750,000. (Id.) The Park Agreement also required MIM to obtain

---

[1] Plaintiff MIM appears to dispute this characterization of the Park Agreement, but does not state specifically what part of the characterization it disputes and does not dispute the existence or language of the Agreement. (ECF No. 36 ¶ 6.) MIM responds similarly to the description of the Park Agreement and the Arch Policy throughout its response to Arch's statement of facts. (See generally ECF No. 36.) Therefore, the facts of the existence and language of the Park Agreement are undisputed and the characterization in this factual background is limited to this section and is not a legal conclusion.

comprehensive general liability insurance and deliver it to MRPP. (Id. at ¶ 10 and ECF No. 33-10 at 21.)

MIM obtained a comprehensive general liability insurance ("CGL") policy ("the Policy") from Defendant Arch covering the May 2023 Events. (ECF No. 36 at ¶ 11.) The CGL Policy is the subject of this case.

On September 8, 2023, after MIM had hosted the Events, MRPP sued MIM in Tennessee state court for breach of contract. MRPP alleged that MIM had failed to pay for the damage to the Park required by the Park Agreement. (See ECF No. 33-10 at 2-10 and ECF No 36 at ¶ 19.) MRPP alleged $1,425,366 in damages, so that MIM would owe an additional $675,366. (See ECF No. 33-10 at 2-10 and ECF No 36 at ¶¶ 21-22.) MRPP's complaint seeks $675,366 plus interest and attorneys' fees. (ECF No. 33-10 at 2-10.) The state court case is ongoing. See generally Ct. Docket, Riverfront Development v. Memphis in May, CT-3703-23 (Tenn. Cir. Ct. Div. 9, filed September 8, 2023) https://circuitdata.shelbycountytn .gov/crweb/ck_public_qry_doct.cp_dktrpt_frames?backto=D&case_id =CT-3703-23&begin_date=&end_date=.

In August 2023, relying on the Arch Policy, MIM asserted policy coverage for and defense against the damages MRPP sought in its state case. (ECF No. 36, ¶¶ 25, 27.) Arch denied coverage on October 13, 2023. (Id. at ¶ 26.) On April 2, 2024, Plaintiff

3

MIM filed suit against Defendant Arch in Tennessee court seeking (1) a declaratory judgement that the Policy covers the damages MRPP seeks from MIM in its state case, (2) breach of contract, (3) promissory estoppel, and (4) statutory bad faith under Tenn. Code Ann. § 56-7-105. (Id. ¶ 28.) Arch removed MIM's suit to this Court on May 16, 2024, and brought the instant motion for summary judgment on all claims on June 12, 2025. (ECF No. 33.)

## II.   Jurisdiction and Choice of Law

The Court has diversity jurisdiction under 28 U.S.C. § 1332.  A federal district court has original jurisdiction of all civil actions between citizens of different states "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1).

For purposes of jurisdiction, MIM is a citizen of the State of Tennessee, with its principal place of business in Memphis, Tennessee. (ECF No. 1 ¶ 4.) Arch is a foreign corporation organized under Missouri law with its principal place of business in Jersey City, New Jersey, making it a citizen of Missouri and New Jersey. (Id. at ¶¶ 5-6.) The parties are completely diverse.

The amount in controversy exceeds $75,000.  In its complaint, MIM seeks damages "in no event less than the total sum of any damages that may be awarded to MRPP in the MRPP

4

Litigation and the total sum of all costs and fees incurred by Plaintiff in defending itself in connection with said Litigation." (ECF No. 1-3 at 15.) MRPP seeks $675,366 in damages from MIM in the state court case. (ECF No 33-10. at 8.) Even if MIM is successful in defending the state court case, it will seek attorneys' fees from Arch for defending that case. Plaintiff also alleges statutory bad faith under Tenn. Code Ann. § 56-7-105, which carries with it attorneys' fees in this case. (ECF No. 1-3. at 14.) Given the possibility that MIM will lose its state court case and the attorneys' fees at issue in both cases, it is more likely than not that the amount in controversy exceeds $75,000.  The amount in controversy requirement is satisfied.  Williamson v. Aetna Life Ins. Co., 481 F.3d 369, 377 (6th Cir. 2007) (holding that jurisdiction under § 1332 is proper where the amount in controversy "more likely than not" exceeds $75,000).

Federal courts sitting in diversity apply the choice-of-law rules of the forum state.  See Performance Contracting Inc. v. DynaSteel Corp., 750 F.3d 608, 611 (6th Cir. 2014); Mountain Laurel Assurance Co. v. Wortham, No. 217CV02660TLPTMP, 2018 WL 5269829, at *3 (W.D. Tenn. Oct. 23, 2018).  Where insurance contracts lack a choice-of-law provision, "Tennessee courts apply the substantive law of the state in which the policy was issued and delivered."  Standard Fire Ins. Co. v. Chester-

O'Donley & Assocs., Inc., 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998); see also Tenn. Code Ann. § 56-7-102 ("[E]very contract [issued by any insurance company doing business in Tennessee] shall be held as made in [Tennessee] and construed solely according to the laws of [Tennessee]").

The Policy does not have an explicit choice of law provision. It was issued in Tennessee to MIM. (ECF No. 33-8 at 5-7.) Neither party disputes the application of Tennessee law, and both parties argue citing Tennessee law. The Court applies Tennessee law.

### III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must show that the nonmoving party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of its case. See Fed. R. Civ. P. 56(c)(1); Peeples v. City of Detroit, 891 F.3d 622, 630 (6th Cir. 2018). All facts, evidence, and inferences drawn therefrom must be "viewed in the light most favorable to the non-moving

party." Brown v. Bd. of Educ. of Shelby Cnty. Sch., 47 F. Supp. 3d 665, 695 (W.D. Tenn. 2014).

The Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Although summary judgment must be used carefully, it "is 'an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action' rather than a 'disfavored procedural shortcut.'" F.D.I.C. v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).

Questions of law are decided by the Court. Where, as here, the Court has jurisdiction based on diversity of citizenship and Tennessee law applies, the Court must "anticipate or predict how the Tennessee Supreme Court would decide the issues based on all of the available data." Landmark Am. Ins. Co. v. HECO Realty, LLC, No. 1:20-CV-02631-STA-JAY, 2024 WL 4920771, at *7 (W.D. Tenn. Sept. 24, 2024) (citing Fox v. Amazon.com, Inc., 930 F.3d 415, 422 (6th Cir. 2019). That task includes considering the published opinions of the Tennessee Court of Appeals. Lindenberg

v. Jackson Nat'l Life Ins. Co., 912 F.3d 348, 358 (6th Cir. 2018). Unpublished Tennessee Court of Appeals opinions are considered persuasive, nonbinding authority, unless otherwise noted. Tenn. Sup. Ct. R. 4(G)(1). Federal Courts must be "extremely cautious about adopting substantive innovation in state law." Fox, 930 F.3d at 422.


## IV. Analysis

The Tennessee Supreme Court has held that "[i]nsurance policies are, at their core, contracts," and "questions regarding the extent of insurance coverage present issues of law involving the interpretation of contractual language" in the policies. Garrison v. Bickford, 377 S.W.3d 659, 663-64 (Tenn. 2012). Courts interpret insurance policies using the same tenets applied to other contracts. Id. at 664. The policy should be construed as a whole, in a reasonable and logical manner with terms given their ordinary meaning, with the primary purpose "to ascertain and give effect to the intent of the parties." Id., citing Clark v. Sputniks, LLC, 368 S.W.3d 431, 441 (Tenn.2012)

Insurance contracts are "strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." Garrison, 377 S.W.3d at 664; citing Tata v. Nichols,

8

848 S.W.2d 649, 650 (Tenn.1993).  A "strained construction may not be placed on the language used to find ambiguity where none exists." Id., citing Farmers-Peoples Bank v. Clemmer, 519 S.W.2d 801, 805 (Tenn.1975).

Here, the parties disagree about the meaning of the Policy and whether it applies to the damages MRPP seeks in the state court litigation.  This Court construes each relevant clause of the Policy in accordance with the above principles stated above.

### A.    Duty to Defend vs. Duty to Indemnify

MIM asserts in its complaint that Arch owes MIM both the "duty to defend" and the "duty to indemnify" in the state litigation against MRPP. (ECF No. 1-3 at ¶¶ 55, 71-72.) The parties appear to agree that the duty to defend is determinable at the summary judgment stage, while disagreeing about whether the duty to indemnify can be resolved at that stage. (Compare ECF No. 33-2 at 4-5 with ECF No. 35 at 10-13.)

### B.    Duty to Defend

For the following reasons, Arch has a duty to defend MIM in the state court proceeding.  Determining an insurer's duty to defend is a matter of law that "may be resolved by summary judgment where there are no genuine issues of material fact."

9

<u>Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.</u>, 216 S.W.3d 302, 305 (Tenn. 2007).  A duty to defend arises "solely" from "the allegations contained in the underlying complaint."  <u>Id.</u>, citing <u>St. Paul Fire & Marine Ins. Co. v. Torpoco</u>, 879 S.W.2d 831, 835 (Tenn.1994).  "An insurer's duty to defend the insured is triggered when the underlying complaint alleges damages that are within the risk covered by the insurance contract and for which there is a *potential* basis for recovery."  <u>Forrest Const., Inc. v. Cincinnati Ins. Co.</u>, 703 F.3d 359, 363 (6th Cir. 2013) (emphasis in original) (internal quotations omitted).  An insurer cannot "refuse to defend an action against its insured unless it is plain from the face of the complaint that the allegations fail to state facts that bring the case within or potentially within the policy's coverage."  <u>Drexel Chem. Co. v. Bituminous Ins. Co.</u>, 933 S.W.2d 471, 480 (Tenn. Ct. App. 1996) (internal quotations omitted).

The duty to defend arises if even one of the allegations in the concurrent state court case is covered by the insurance policy.  <u>Travelers</u>, 216 S.W.3d at 305.  Although the duty to indemnify is based on facts found by the trier of fact, the duty to defend is "based on the facts alleged."  <u>Id</u>.  Doubt about whether the claimant in the other case has stated a cause of action that falls within the insurance policy's coverage "is resolved in favor of the insured."  <u>Id</u>.

The Court must determine whether MRPP's allegations in the state court case against MIM are "within or potentially within" the Policy's coverage. <u>Drexel Chem. Co.</u>, 933 S.W.2d at 480. Doing so requires the Court to interpret the Policy.[2]

### 1. The meaning of "occurrence"

Arch's Policy provides that Arch "will pay those sums that [MIM] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (ECF No. 36 at ¶ 12) The Policy provides that the insurance "applies to 'bodily injury' and 'property damage' only if: (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" (<u>Id</u>. at ¶ 13) The Policy defines "occurrence" as "an accident,

---

[2] MIM argues that the Court should examine the "entire factual situation in determining whether the underlying suit alleges claims that trigger the insurer's duty to defend," citing <u>Main St. Am. Assurance Co. v. Marble Sols., LLC</u>, 557 F. Supp. 3d 844, 856 (W.D. Tenn. 2021). (ECF No. 35 at 11.) The language from <u>Marble Sols</u>, which is absent context, is unpersuasive. Under Tennessee law, analysis of the duty to defend is limited to the underlying complaint. In <u>Marble Sols</u>, the court did not look beyond the underlying complaint. It considered the factual situation alleged in the underlying complaint to determine whether the insurer had a duty to defend. <u>See Marble Sols.</u>, 557 F. Supp. 3d at 855-858. The quote MIM uses from <u>Marble Sols</u> cites <u>Gassaway v. Travelers Ins. Co.</u>, 439 S.W.2d 605, 607 (1969), which discussed the "entire factual situation" in determining whether an insurer was liable for damages resulting from an underlying lawsuit, not whether the insurer had a duty to defend that lawsuit. <u>Id</u>. The court in <u>Marble Sols</u> used the standard the Court uses here, examining "solely…the allegations contained in the underlying complaint." <u>Marble Sols.</u>, 557 F. Supp. 3d at 851 (citing <u>Travelers</u>, 216 S.W.3d at 305).

including continuous or repeated exposure to substantially the same general harmful conditions." (Id.)

"The insuring agreement should be construed before the exclusions." Travelers, 216 S.W.3d at 306. Both parties agree that, for purposes of summary judgment, the damage to Tom Lee Park that MRPP alleges constitutes "property damage." (Compare ECF No. 33-2 at 7 with ECF No. 35 at 12.) The parties dispute whether the damage to the Park was an "occurrence" as defined by the Policy. (ECF No. 33-2 at 6 and ECF No. 35 at 10.) Where, as here, the relevant factual record is undisputed, deciding whether there was an "occurrence" under an insurance policy is proper when deciding a motion for summary judgment. See Travelers, 216 S.W.3d at 304-08.

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ECF No. 36 at ¶ 13.) In Travelers, the Tennessee Supreme Court concluded that "accident" in a CGL policy means "an unforeseen or unexpected event." 216 S.W.3d at 308. That can include "negligent acts of the insured causing damage which is undesigned and unexpected." Id. The Tennessee Supreme Court "consider[s] foreseeability from the perspective of the insured." Id. In general, this Court must construe the Policy in favor of the insured. See Travelers, 216 S.W.3d at 305 ("Any doubt as to whether the claimant has stated a cause of action

12

within the coverage of the policy is resolved in favor of the insured"); see also Planet Rock, Inc. v. Regis Ins. Co., 6 S.W.3d 484, 491 (Tenn. Ct. App. 1999) (giving the underlying complaint a "liberal construction" in finding for the insured); see also Am. Justice Ins. Reciprocal v. Hutchison, 15 S.W.3d 811, 815 (Tenn. 2000) ("If the ambiguous language limits the coverage of an insurance policy, that language must be construed against the insurance company and in favor of the insured").

Defendant Arch's central argument is that Plaintiff MIM expected the damage to the Park because of clauses in the Park Agreement between MIM and MRPP. (ECF No. 33-2 at 6-10.) Those clauses include the damages allocation clause described above, the parties' general plan to inspect the Park before and after the Events, and other minor clauses that require MIM to make reasonable efforts to minimize damage to the Park. (Id.) As stated, the damages allocation clause allocated the first $350,000 in damages to the Park to the City of Memphis, the next $250,000 in damages to MIM, the next $150,000 in damages to the City, and all additional damages to MIM. (ECF No. 36 at ¶ 6.) Arch argues that this clause in the Park Agreement means that MIM foresaw damages to the Park, even those in excess of $750,000, making those damages expected and not based on an "accident" or an "occurrence" under the Policy. (ECF No. 33-2 at 6-10.) Plaintiff MIM responds that the damages in excess of

13

$750,000, for which it is being sued in the concurrent state court case, were unexpected and are based on an "occurrence" under the Policy. (ECF No. 35 at 12-13.)

The alleged damages in excess of $750,000 are based on an "occurrence" under the Policy.  MRPP's complaint in the state court case does not specifically allege what caused the damage to the Park.[3] (ECF No. 33-10 at 2-10.) The complaint does allege the dollar amount of damages, along with an attached exhibit detailing some of the specifics of the alleged damages. (ECF No. 33-10 at 7.) The complaint also alleges that damages exceeded the $750,000 the parties allocated in the Park Agreement.

One might argue that MIM expected some damage to the Park, but one cannot know from the complaint how the damage was alleged to have occurred, and one cannot conclude from the undisputed record that MIM expected damages to the Park to exceed $750,000. MIM's failure to expect the amount of damage alleged is evidenced by the fact that the Park Agreement required MIM to purchase CGL insurance to cover "property damages," presumably because MIM would be liable for all damages to the Park in excess of $750,000. (ECF No. 33-10 at 21.) The same provision required MIM to present

---

[3] The most specific statement in the complaint is that the damages resulted "from [MIM's] 2023 festivals." (ECF No. 33-10 at 3.) That statement comes from the complaint's introduction, not its set of numbered factual allegations. (Id.)

the CGL policy it purchased to MRPP and prevented MIM from canceling that policy without notifying MRPP. (Id.)

The before-and-after Park inspections and the contractual requirements that MIM take steps to minimize damage to the Park do not demonstrate that MIM expected damages in excess of $750,000. Merely taking precautions for an event is not conclusive evidence that the precaution taker expected the event. One would not say that one "expects" a fire because one owns a fire extinguisher. Arch's logic would imply that purchasing insurance to cover an event means that one expects the event, making insurance contracts meaningless. See Crestbrook Ins. Co. v. Crosby, No. 2:22-CV-2406-MSN-ATC, 2023 WL 3767085, at *6 (W.D. Tenn. June 1, 2023) ("some outcomes that are foreseeable are nevertheless 'accidents': Otherwise, a liability policy would be rendered almost meaningless") (citing Travelers, 216 S.W. 3d at 308-09).[4]

For purposes of determining the duty to defend, the damages in excess of $750,000 that MRPP claims in the concurrent state court case were based on an "occurrence" under the Policy. The state court complaint does not specify the manner in which the damages alleged occurred, and the undisputed record demonstrates

---

[4] Although Crestbrook discusses this point in the context of whether particular negligent acts are covered by an insurance policy, the principle is the same as the principle here.

that MIM did not expect damage to the Park to exceed $750,000. Because there was an occurrence, the state court claim, at this stage of the analysis, alleges damages "within or potentially within the policy's coverage."  Drexel Chem. Co., 933 S.W.2d at 480.[5]

### 2. Exclusion 2.j.(1), of Property "Rent, Owned, or Occupied."

After Tennessee courts interpret the insuring agreement, they consider its exclusions.  Travelers, 216 S.W.3d at 306.  For Arch to have a duty to defend, the MRPP state court allegations must not fall under an exclusion and must come "within or potentially within the policy's coverage."  Drexel Chem. Co., 933 S.W.2d at 480.

---

[5] MIM argues that this Court should decide that the damage MRPP alleges to the Park is an "occurrence" based on a letter from Mark Thompson of American Specialty, Arch's authorized agent, to MIM. (ECF No. 35 at 7, 12.) In that letter, Thompson says that the damage to the Park constitutes an "occurrence," but denies coverage on different grounds. (ECF No. 33-8.) Inconsistent, out-of-court positions taken by Arch and its agents are not relevant to defining "occurrence" for purposes of the present analysis.  An insurer may give alternate or incorrect legal reasons for its denial of coverage and not be estopped from correcting or offering different reasons for denying coverage in court. See Richards Mfg. Co. v. Great Am. Ins. Co., 773 S.W.2d 916, 919 (Tenn. Ct. App. 1988) ("if the insurer gives proper notice of a reservation of rights it will not waive its rights to rely on a breach of condition…. It is not required that the reason given for the insurer's position be legally correct.  The position taken may be correct, but for other legal reasons.  It is the insurer's conclusion regarding the existence or non-existence of certain coverage that must be clearly and fairly communicated to the insured, not its legal reasons therefor")

16

Arch argues that the alleged damage to the Park is excluded by 2.j.(1) of the Policy. (ECF No. 33-2 at 10-13.) That exclusion provides that the insurance does not apply to "property damage [to]…property you own, rent, or occupy."[6] (Id. at 11.) Arch argues that MIM "rented" and/or "occupied" the Park, so that the property damage alleged falls under the exclusion. (Id. at 11-13.) Arch relies on the language of the Park Agreement between MIM and MRPP, the property relationship between the two parties established by that Agreement, and the meaning of the word "rent". (Id.)

MIM argues that it did not "rent" or "occupy" the Park, but had a license to use the Park for the Events, so that the alleged damage to the Park is not excluded by the 2.j.(1) exclusion. (ECF No. 35 at 15-18.) In the alternative, MIM argues that there is an exception to the exclusion that covers the damage alleged in the state court case.  Section 2.j. in relevant part, provides that exclusion 2.j.(1) does "not apply to 'property damage'…to premises…rented to you for a period of seven or fewer consecutive days."[7] (ECF No 35 at 15-17.) MIM argues that, even if it rented the Park, the exception applies because any rental or occupation did not exceed seven consecutive days, but lasted only during

---

[6] "you" in this context refers to MIM, the insured party.

[7] This exception to the 2.j.(1) exclusion does not include the terms "occupy" or "own."

the Events that took place during May 5-7, 2023, and May 17-20, 2023. (Id.)

MIM argues that "there are genuine and material factual disputes as to whether MIM 'rented' the [Park] for the Events." (Id. at 17.) However, MIM disputes no facts relevant to this issue.  Instead, it argues that the Park Agreement between MIM and MRPP is a license.  That is, MIM disputes the legal characterization of the contractual relationship between itself and MRPP governing MIM's use of the Park.

The Court need only interpret the Policy and the Park Agreement to decide whether MIM "rented" or "occupied" the Park for purposes of determining the duty to defend.  Both are issues of law, not fact.  See Clark, 368 S.W.3d at 441 (Tenn. 2012) ("[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language") and Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999) ("[t]he interpretation of a contract is a matter of law"). It is for the Court to interpret the Park Agreement and to decide whether MIM "rented" or "occupied" the Park during the relevant time.[8]

---

[8] The Parties do not dispute the existence or content of the Park Agreement. (ECF No. 36 at ¶2.) They only disagree about its meaning.

Insurance policy exclusions "must be construed against the insurance company and in favor of the insured." Martin v. Powers, 505 S.W.3d 512, 517 (Tenn. 2016) (citing Travelers Ins. Co. v. Aetna Cas. & Sur. Co., 491 S.W.2d 363, 367 (Tenn. 1973)).[9] That standard is consistent with the standard that "contracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." Martin, 505 S.W.3d at 517.

The Policy does not define "rent" or "occupy." When a policy does not define words, Tennessee courts give "those words their usual, natural and ordinary meaning." Marlin Fin. & Leasing Corp. v. Nationwide Mut. Ins. Co., 157 S.W.3d 796, 809 (Tenn. Ct. App. 2004) (internal citations omitted). Black's Law Dictionary defines "rent" as "to pay for the use of another's property." RENT, Black's Law Dictionary (12th ed. 2024). The parties cite no cases and the Court is aware of no cases decided under Tennessee law that define the phrase "own, rent, or occupy"

---

[9] Arch quotes language from a 1998 Tennessee Court of Appeals case that says "[e]xclusions should not be construed broadly in favor of the insurer, nor should they be construed so narrowly as to defeat their intended purpose." Standard Fire Ins. Co., 972 S.W.2d at 8. That appears to be a slightly different standard for interpreting insurance policy exclusions than the standard used by the Tennessee Supreme Court in Martin in 2016. The Tennessee Supreme Court does not appear to have cited language from Standard Fire since deciding Martin. The Tennessee Supreme Court standard controls.

in the context of a CGL insurance policy, although that phrase is relatively common in CGL policies. See 9 Couch on Ins. § 126:16 ("The two most common are exclusions related to property in the insured's 'care, custody, and control' and to property 'owned, rented, or occupied' by the insured").

Determining whether and for how long MIM rented or occupied the Park initially appears straightforward. MIM signed the Park Agreement with MRPP for use of the Park. (ECF No. 36 at ¶¶ 2-3.) MIM was defined as a "renter" in that Agreement. (Id. at ¶ 4.) The Agreement provided that MIM would "occupy and use the Park from April 22,2023-May 27, 2023." (Id.) That included necessary set up and disassembly days surrounding the two Events. (Id.) The period is longer than seven consecutive days, the exception to the exclusion that MIM argues applies. MIM nowhere alleges that it performed the Park Agreement on different dates or in a way different than the Agreement provides. The Policy itself refers to the Park as premises that MIM owns, rents, or occupies. (ECF No. 33-5 at 15.) Based on the language of the Park Agreement and the ordinary use of the words "rent" and "occupy," it might appear that MIM rented or occupied the Park for more than seven consecutive days, so that the damage alleged by MRPP is excluded by the Policy.

However, the inquiry does not end there. Tennessee courts have not merely taken the language used in a contract conveying

a property interest to define the property interest at stake. In Williams v. Starace, for instance, the Court of Appeals concluded that a contract titled "Agreement of Purchase and Sale" of a property was a lease of that property, not a sale. Williams v. Starace, No. 85-162-II, 1985 WL 4074, at *1 (Tenn. Ct. App. Oct. 29, 1985) ("This Court concludes that the 'Agreement of Purchase and Sale' was, in effect a lease of the described property"). The court analyzed the language of the contract itself and the rights accorded the parties. Id. A federal court applying Tennessee law took a similar approach in United States v. Anderson Cnty., Tenn., 575 F. Supp. 574 (E.D. Tenn. 1983), aff'd, 761 F.2d 1169 (6th Cir. 1985). There, the court examined the property interest actually conveyed to a party (Union Carbide) rather than the label the parties applied to the property interest. The court reasoned that: "[i]n determining what interest Union Carbide may have in [the property], however, the Court is not bound by the terminology used by the parties to the Contract." Anderson Cnty., 575 F. Supp. at 576. This Court must therefore consider the language and the rights accorded MIM in the Park Agreement, and not merely characterize the Agreement as a rental agreement based on its title and terminology.

MIM argues that, despite its title, the Park Agreement was in fact a "license" to use the Park for the April 22 to May 27 period. (ECF No. 35 at 15-18.) MIM argues that, because the

21

Agreement was a mere license, it did not "rent" or "occupy" the Park during that period, and that, if it did "rent" the Park, it did so for fewer than seven consecutive days. (Id.) As stated, this Court is aware of no cases decided under Tennessee law that have collectively defined "own, rent, or occupy" or their variations in a CGL contract.  The only case of which the Court is aware that speaks to this issue is Paktank Louisiana, Inc. v. Marsh & McLennan, Inc., 688 F. Supp. 1087, 1092 (E.D. La. 1988). In Paktank, decided under New York law, the court concluded that an insurance policy's exclusion of property damage to property "owned or occupied by or rented to the insured" did not apply to a dock the insured had a license to use.  Id. at 1093.[10]  This Court will apply that principle here.  If MIM can show that it had a license to use the Park during the term of the Agreement, the damage to the property would not be excluded by exclusion 2.j.(1).

"A 'license,' with respect to real estate, is an authority to do a particular act or series of acts on another's land without possessing any estate therein."  Lange v. Sullivan, No. W201801218COAR3CV, 2019 WL 2024581, at *2 (Tenn. Ct. App. May 8,

---

[10] The Paktank court did find that the policy excluded the dock damage because the insured "used" the property in accordance with a different exclusion mandating that damage to "property used by the insured" was excluded from coverage, an exclusion not found in Arch's Policy.  Paktank, 688 F. Supp. at 1093.

2019) (citing <u>Barksdale v. Marcum</u>, 7 Tenn. App. 697, 708, perm. app. denied (Tenn. July 14, 1928)).    Licenses are "not assignable, and [are] generally revocable at the will of the licensor."    <u>Anderson Cnty.</u>, 575 F. Supp. at 578, (citing <u>Barksdale</u>, 7 Tenn. App. At 708).    Licenses "generally do[] not create an interest in land."    <u>Lange</u>, 2019 WL 2024581, at *2.

MIM cites <u>Anderson Cnty.</u>, to demonstrate the difference between a license and a lease.[11]    In that case, discussed above, the court applied Tennessee law in deciding how to determine the property relationship between the U.S. government, which owned a piece of land, and Union Carbide, which used that land. <u>Anderson Cnty.</u>, 575 F. Supp. 574.    In addition to the factors cited above, the court wrote that, "[g]enerally, during the existence of a lease, the tenant is the owner of the premises and entitled to exclusive possession." <u>Id</u>. at 577.    The absence of exclusive possession favored finding a license.    <u>Id</u>.    In <u>Anderson Cnty.</u>, stringent limitations on using and altering the property weighed in favor of finding a license rather than a lease. <u>Id</u>. at 578 ("control over the business of [Union Carbide]

---

[11] Although the Policy uses the term "rent" rather than "lease," the two are largely synonymous.  <u>See</u> LEASE, Black's Law Dictionary (12th ed. 2024) "A contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, **usu. rent**" (emphasis added).  Even if the two are not synonymous, the analysis in <u>Anderson Cnty.</u> is relevant in deciding what a "license" is and is therefore relevant here.

and rights of entry and inspection retained by the owner of the realty are so extensive as to negative any notion that a lease of the realty was intended or effected").

Summarizing the caselaw above, when determining whether a party's property rights constitute a license, Tennessee law considers (1) whether there is specific authority to do a particular act or series of acts on another's land without possessing any estate therein; (2) whether the right is assignable; (3) whether the rights are revocable at the will of the licensor; (4) whether the user of property has exclusive possession; and (5) the extent to which the use is limited and regulated by the owner.

### a. Authority to do particular acts

Factor (1) addresses the purpose of the agreement. "A 'license,' with respect to real estate, is an authority to do a particular act or series of acts on another's land without possessing any estate therein." Lange, 2019 WL 2024581, at *2. Section 1 of the Park Agreement provides that "[MRPP] hereby grants permission to [MIM] to use the Park…for the Beale Street Music Festival and World Championship Barbeque Cooking Contest." (ECF 33-10 at 11.) The Agreement later provides that "[MIM] will use the Park for the Event (which includes the Beale Street Music Festival and World Championship Barbeque Cooking Contest)…and

24

for no other purpose whatsoever without the prior written consent of [MRPP]." (Id.) The language in the Agreement is clear that MIM's use of the Park is limited to a particular set of acts on MRPP's land during and surrounding the Events.  It is not a general grant of an interest in a property, but a specific grant of the authority to do particular acts on a piece of property. Factor (1) therefore favors finding that MIM's interest is a license.

### b.  Assignability

Factor (2) considers assignability of the potential property interest.  Section 24 of the Park Agreement's terms and conditions provides that "[MIM] shall not assign this Agreement." (ECF No. 33-10 at 22.) A license is not assignable.  Barksdale, 7 Tenn. App. at 708.  Factor (2) therefore favors finding a license between MIM and MRPP.

### c. Revocability

Factor (3) says that licenses are "generally revocable at the will of the licensor."  Id.  The Park Agreement does not appear to be revocable at the will of the licensor, MRPP.  No clause in the agreement explicitly grants or denies revocability. The third clause of the terms and conditions provides that "[MRPP] shall have the right to immediately terminate this

25

Agreement upon the failure to comply with the Park Agreement," but later provides that MIM has a right to cure any such failure. (ECF No. 33-10 at 15.) Therefore, this factor weighs against finding a license for MIM to use the Park.

### d. Exclusive Possession

Factor (4) addresses exclusive possession. Absence of a right of exclusive possession suggests a license rather than a lease. See Anderson Cnty., 575 F. Supp. at 577-78. The Park Agreement provides that "[a]ny exclusive use of the Park by Renter shall be limited to the places and times shown in this Agreement (May 5 - 7, 2023 and May 17 - 20, 2023) or as otherwise agreed in writing by Renter and Partnership." (ECF No. 33-10 at 16.) Neither party has offered a written agreement altering this section.

Section thirteen of the terms and conditions lays out policies to maintain public access to the Park, even during the "rental period." (Id. at 19.) It provides that "[MIM] shall ensure uninhibited public access from the Riverside Drive pedestrian bridge across Ashburn-Coppock Park to Martyrs Park at all times. To provide connected access to the riverfront throughout the month of May, the Bluff Walk must remain open at all times during the Event rental period unless closed at the written direction of Memphis Police Department." (Id.)

26

Section three of the terms and conditions provides that "Representatives of [MRPP] shall be designated by [MRPP] prior to the event and shall have the right to enter all portions of the Park at any time and on any occasion, including entering the portion of the Park rented to [MIM]." (Id. at 15.) Thus, the owner retained a right to enter at all times throughout the Agreement.

The Park Agreement does not grant a right of exclusive possession to MIM. Factor (4) therefore weighs in favor of finding that the Park Agreement grants a license.

### e. Owner Regulation of Use

Factor (5) addresses the owner's regulation of the property's use. In Anderson Cnty., the court found that "control over the business of [the licensee] and rights of entry and inspection retained by the owner of the realty are so extensive as to negative any notion that a lease of the realty was intended or effected." The court therefore found a license rather than a lease in the agreement to use the land. Anderson Cnty., 575 F. Supp. at 574. In the Park Agreement, MIM's use of the Park is also highly regulated by the terms and conditions. For example, section five regulates the sale of alcohol by vendors at the Park. (ECF No. 33-10 at 16.) Section eight mandates approval by MRPP of any electrical, plumbing, carpentry, and

27

other services MIM requires during its use of the Park. (Id.) Section eleven mandates how and when litter is to be removed and limits the use of pyrotechnics at the Park. (Id. at 17.) Section twelve prevents MIM from erecting fences at certain Park locations. (Id. at 19.) Section fourteen bars MIM from driving stakes into the ground at certain locations. (Id. at 20.) The Operation Policy and Procedures detail the specific paths MIM's vendors, subcontractors, employees, and other associated persons may use during the Events. (Id. at 23.)

In short, the Park Agreement's regulations of MIM's activities are so extensive that characterizing MIM's interest in the Park as a leasehold or rental would be improper. Like the agreement in Anderson Cnty., this factor favors finding a license.

### f. Conclusion

Factors (1), (2), (4), and (5) favor finding that MIM had a license from MRPP to use the Park. Only factor (3) weighs against that conclusion. Even if Factor (4), addressing exclusive possession, were construed to weigh in favor of finding a rental during the Event dates of May 5-7 and 17-20, 2023, that period would fall under the exception to exclusion 2.j.(1).

Arch argues that this result would create a "moral hazard" because other courts have held that the primary function of "own, rent, or occupy" exclusions is to "prevent the insured from using

28

a liability insurance policy as if it provided property insurance and insulate against the moral hazard problem where an insured has less incentive to take precaution owing to the existence of insurance." Charter Oak Fire Ins. Co. v. Coleman, 273 F. Supp. 2d 903, 912 (W.D. Ky. 2003) (internal citations omitted). That argument is unpersuasive for three reasons.

First, finding MIM had a license to use the Park accords with the general principle stated in Charter Oak. "Tennessee Courts have uniformly held that licenses create no interest in real property." Lange, 2019 WL 2024581 at *2.

Second, the Park Agreement itself mandates and incentivizes MIM to take precautions to minimize damage to the Park. The Park Agreement explicitly provides measures MIM must take to protect the Park.[12] The Park Agreement's damage allocation clauses also incentivize MIM to minimize damage to the Park. (ECF No. 33-10 at 11-12.)

Third, the Policy provides some level of property insurance in exception K(1), discussed below. That section provides an exception to exclusion 2.j.(1). Exception K(1) provides that

---

[12] Clause seven states that "[MIM] shall promote positive messages about the Park and urge its vendors, volunteers, BBQ team members and guests, and ticket buyers to respect the Park to avoid damaging the Park property". The Operation Policy and Procedures state that "[MIM] agrees to survey all irrigation prior to laying out and set up the festival to minimize damage done to the system" and states in detail other precautionary measures MIM must take to protect the Park. (ECF No. 33-10 at 12 and 23-24.)

exclusion 2.j.(1) "do[es] not apply to damages to premises while rented to you, or temporarily occupied by you with permission of the owner, caused by fire, lightning, explosion, smoke, aircraft or vehicles, riot or civil commotion, vandalism, leakage from fire extinguishing equipment or water damage." (ECF No. 33-5 at 59.) The "moral hazard" principle, that the exclusion must be read so as to "prevent the insured from using a liability insurance policy as if it provided property insurance", does not clearly apply to the Policy at issue here, because the Policy does provide some level of property insurance.

Because MIM did not "own, rent, or occupy" the Park, but had a license, in the language of the Park Agreement, to "use the Park for the Event[s]," (ECF No. 33-10 at 11.) the alleged damage to the Park is not excluded by exclusion 2.j.(1) of the Policy.

### 3. Exclusion 2.a., of damages "expected or intended"

The Policy includes a different exclusion that Arch argues applies to MRPP's Park damages claims.  Section 2.a. excludes "property damage expected or intended from the standpoint of the insured." (ECF No. 36 at ¶ 16.) Arch argues, for many of the reasons considered above in the section analyzing the term

"occurrence," that MIM "expected" the damages to the Park and that the exclusion therefore applies. (ECF No. 33-10 at 17-18.)

"Expected or intended" clauses are common in insurance policies.  See generally 31 A.L.R.4th 957 (1984).  The Supreme Court of Tennessee has decided that, "in order to find that an intended or expected acts exclusion applies, it must be established that the insured intended the act *and* also intended or expected that injury would result."  Tennessee Farmers Mut. Ins. Co. v. Evans, 814 S.W.2d 49, 55 (Tenn. 1991) (emphasis in original).  Whether the insured expected and intended the acts and consequences are "separate and distinct inquiries." Id.  The "purpose of such exclusionary language is to prohibit the use of insurance to provide indemnity for civil tort liability that results from an insured's intentional wrongdoing." Id. at 54.

Arch makes no argument and identifies nothing in MRPP's state court complaint alleging that MIM "intended" to damage the Park. (ECF No. 33-2 at 17-18.) Arch also makes no argument that MIM intentionally committed specific acts for which harm to the Park was reasonably foreseeable. (Id.) If Arch were to contend that the "act" was hosting the Events, the exclusion would be so broad so as to swallow much of the Policy.  It would be inconsistent with the general purpose established by the Supreme Court of Tennessee that such exclusions are to prevent liability resulting "from an insured's intentional wrongdoing."  Tennessee

<u>Farmers Mut. Ins. Co.</u>, 814 S.W.2d at 54.    Insurance policy exclusions "must be construed against the insurance company and in favor of the insured." <u>Martin</u>, 505 S.W.3d at 517.  Tennessee Courts have typically held this exclusion to apply to instances of specific, intentional, harmful acts. <u>See</u> <u>Tennessee Farmers Mut. Ins. Co.</u>, 814 S.W.2d at 56 (concluding that the exclusion applied because a woman intended to injure someone by burning money from a safety deposit box) <u>and</u> <u>Metro. Prop. & Cas. Ins. Co. v. Buckner</u>, 302 S.W.3d 288, 297 (Tenn. Ct. App. 2009) (applying the exclusion to acts by a pair of teenage brothers who fired BB guns at the interstate).   Exclusion 2.a. does not exclude the damage to the Park that MRPP alleges in the state court case.[13]

### 4. Vandalism

Section K(1) in the "excess policy" portion of the Policy provides that the relevant exclusions, including exclusion 2.j.(1) discussed above, "do not apply to damages to premises while rented to you, or temporarily occupied by you with

---

[13] Arch cites language from <u>Tennessee Farmers Mut. Ins. Co.</u> that "[i]t is immaterial that the actual harm was of a different character or magnitude or nature than that intended." 814 S.W.2d at 55.  This principle governing the kind of harm "expected or intended" from an action is limited to the analysis of "expected or intended" exclusions, and not a general statement of the definition of "expected" that would affect the analysis of "occurrence" above. <u>Id</u>.

permission of the owner, caused by…riot or civil commotion, [or] vandalism." (ECF No. 33-5 at 59.) The parties appear to agree that, if the damage to the Park were the result of vandalism, this exception to the exclusions would apply and the Policy would cover the alleged damage to the Park, triggering the duty to defend. (Compare ECF no. 33-2 at 16-17 with ECF No. 35 at 18-19.)

A duty to defend arises solely from "the allegations contained in the underlying complaint." Travelers, 216 S.W.3d at 305. "The pleading test for determination of the duty to defend is based exclusively on the facts as *alleged* rather than on the facts as they actually are." St. Paul, 879 S.W.2d at 835. Doubts about whether the claimant in the concurrent case has stated a cause of action that falls within the insurance policy's coverage are "resolved in favor of the insured." Travelers, 216 S.W.3d at 305.

Section K(1) applies to premises "rented" to or "temporarily occupied" by the Plaintiff. (ECF No. 33-5 at 59.) The Court has concluded that, because MIM had a license to use the Park, it did not "rent" or "occupy" the Park in the sense of the "own, rent, or occupy" exclusion. That analysis applies to the term "rent" here, but not necessarily to the term "temporarily occupy." Deciding whether MIM "temporarily occupied" the Park

at this stage, however, is unnecessary, because MRPP's complaint does not allege facts that trigger the clause.

MRPP's complaint does not allege acts of civil commotion or vandalism that might have damaged the Park. (ECF No. 33-10 at 2-10.) The complaint does not allege or describe how the damage occurred at all, beyond generally alleging that it occurred "from" the Events. (Id.) MRPP's complaint is insufficient to trigger Arch's duty to defend based on this exception to the exclusions.  Although it is possible that facts could emerge to make this clause relevant in the course of litigation in this case or in the state court case, the complaint does not allege sufficient facts here.  Therefore, this exception does not require Arch to defend in the state court case.[14]

Because MIM had a license to use the Park, the damage to the Park alleged by MRPP in the state court suit against MIM falls within the Policy, triggering Arch's duty to defend.  The Court **DENIES** Arch's motion for summary judgment on MIM's breach of contract claim that Arch failed to fulfill its duty to defend.

---

[14] This conclusion does not mean the exception will be irrelevant when determining Arch's duty to indemnify.  Facts may arise in the state case that may trigger this clause although those facts are not alleged in the complaint.

34

### C.    The Duty to Indemnify

The duty to indemnify is distinct from the duty to defend. "The duty to defend is based on the facts alleged, while the duty to indemnify is based upon the facts found by the trier of fact." Travelers, 216 S.W.3d at 305.

Arch argues that it is entitled to summary judgment on its duty to indemnify. (ECF No. 33-2 at 4-6.) Tennessee courts and courts applying Tennessee law typically refrain from deciding the duty to indemnify at the summary judgment stage, especially when the underlying case has yet to be resolved. See Marble Sols., 557 F. Supp. 3d at 859-60 ("Because the duty to indemnify turns on the facts as determined by a trier of fact, courts have held that this question is not amenable for determination at the summary judgment stage", collecting cases); see also St. Paul, 879 S.W.2d at 834 (holding that the duty to indemnify "issue is not appropriate for summary judgment"); Policeman's Ben. Ass'n of Nashville v. Nautilus Ins. Co., No. M2001-00611-COA-R3CV, 2002 WL 126311, at *8 (Tenn. Ct. App. Feb. 1, 2002) ("[b]ecause an insured's duty to indemnify is dependent upon the outcome of a case, any declaration as to the duty to indemnify is premature unless there has been a resolution of the underlying claim" (internal citations omitted)).  MIM disputes facts that may or may not emerge in the state court case, such as the causes of the damage to the Park, which may affect this case. (ECF No. 35

at 19.) Summary judgment on this issue at this stage would be premature.

The Court therefore **DENIES** Arch's motion for summary judgment on MIM's claim of breach of contract for violation of Arch's duty to indemnify.

### D. Promissory Estoppel

Arch also seeks summary judgment on MIM's promissory estoppel claim. (ECF No. 33-2 at 19.) MIM alleges that Arch is promissorily estopped by representations of its agents that Arch or its representatives would provide a policy that would cover damage to the Park and delivered a policy that did not. (ECF No. 1-3 at 13-14.)

This claim depends on whether the Policy covers the damage to the Park that MRPP alleges. The Court has concluded that the Policy includes a duty to defend MIM in the state court case. The Court has not determined whether the Policy includes a duty to indemnify in that case. Therefore, it is unclear at this stage whether Arch has failed to fulfill its promise to deliver a policy that would cover the damage MRPP alleges, let alone whether Arch is estopped. That precludes the Court at this stage from determining whether Arch is promissorily estopped by the representations of its representatives.

The Court **DENIES** Arch's claim for summary judgment on MIM's promissory estoppel claim.

### E.   Statutory Bad Faith

Arch argues for summary judgment on MIM's statutory bad faith claim arising under Tenn. Code Ann. § 56-7-105. (ECF No. 33-2 at 20-21.) Arch argues that § 56-7-105 does not apply to CGL policies, like the Policy in this case, (Id.), citing For Senior Help, LLC v. Westchester Fire Ins. Co., 515 F. Supp. 3d 787, 800 (M.D. Tenn. 2021) and Tennessee Farmers Mut. Ins. Co. v. Cherry, 213 Tenn. 391, 394, 374 S.W.2d 371, 372 (1964).   MIM concedes that those authorities preclude a bad faith claim on the Policy at issue here. (ECF No. 35 at 22.)

The Court **GRANTS** Arch's motion for summary judgment on MIM's statutory bad faith claim.

### V.   Conclusion

For the reasons above, the Court **DENIES IN PART** and **GRANTS IN PART** Defendant's motion for summary judgment.   The Court **DENIES** Defendant's motion for summary judgment on Plaintiff's promissory estoppel claim and its breach of contract claims, including its duty to defend claim.   The Court **GRANTS** Defendant's

37

motion for summary judgment on Plaintiff's statutory bad faith claim.


So ordered this 30th day of March, 2026.


/s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE